**JUDGE GARDEPHE**



08 CV 7375

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

LOUISIANA MUNICIPAL POLICE
EMPLOYEES RETIREMENT SYSTEM,
Derivatively and on Behalf of CITIGROUP,
INC.,

        Plaintiff,

    vs.

JOHN A. THAIN, CAROL T. CHRIST,
ARMANDO M. CODINA, JUDITH MAYHEW
JONAS, VIRGIS W. COLBERT, ALBERTO
CRIBIORE, AULANA L. PETERS, CHARLES
O. ROSSOTTI, JOHN D. FINNEGAN, JOSEPH
W. PRUEHER, ANN N. REESE, E. STANLEY
O'NEAL, NELSON CHAI, GREGORY J.
FLEMING, ROBERT J. MCCANN, PETER S.
KRAUS, JEFFREY N. EDWARDS, ERIC
HEATON, AHMASS L. FAKAHANY, DOW
KIM, THOMAS K. MONTAG, DAVID
SLOBOTKA, JEFF SCHULTZ, SCOTT
BROWN, THOMAS J. MURRAY, FRANCES
M. CONSTABLE, JOHN PRICE, MARY
ROONEY, MARTIN MAURO, KEVIN J.
CONERY, DEREK SIN, JOHN MAIER AND
ROSEMARY T. BERKERY,

        Defendants,

    and

MERRILL LYNCH & CO., INC.,

        Nominal Defendant.

Case No. _____

RECEIVED
AUG 20 2008
U.S.D.C. S.D. N.Y.
CASHIERS

VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT FOR BREACH OF
FIDUCIARY DUTY, ABUSE OF CONTROL,
GROSS MISMANAGEMENT, AND
VIOLATIONS OF THE SECURITIES
EXCHANGE ACT OF 1934

**Jury Trial Demanded**

 

Plaintiff, by its undersigned attorneys, submits this Shareholder Derivative Complaint ("Complaint") against each of the individual defendants ("Defendants") named herein and, nominally, against Merrill Lynch & Co., Inc. ("Merrill" or the "Company").

## NATURE OF THE ACTION

1.      Merrill Lynch & Co. has been a household name for generations.  One of the leading providers of financial services in the world (with tens of millions of customer accounts), Merrill depends for its success on the identity of its brand – and its reputation for honesty and integrity.

2.      Today – through the misconduct of certain officers and directors named as defendants herein – Merrill's reputation lies in tatters.  Defendants consciously steered the Company down a path of deceit and manipulation in the market for so-called auction rate securities ("ARS") that will take years to recover from and cost Merrill *tens of billions of dollars* in settlements, fines, and lost business.  The Company has been the target of an administrative proceeding by the Securities and Exchange Commission ("SEC") relating to ARS, Massachusetts securities regulators have commenced proceedings against the Company, and today or tomorrow the New York Office of Attorney General is expected to bring its own lawsuit.  These lawsuits come on the heels of Defendants' announcement that Merrill will *buy back as much as $12,000,000,000 in ARS* from about 30,000 customers.  Even so staggering an offer could not change the mind of the New York Attorney General, who termed it "an inadequate response" to the wrongdoing.

3.      Plaintiff Louisiana Municipal Police Employees Retirement System (the "Retirement System" or "Plaintiff") is a large institutional shareholder of Merrill.  The Retirement System is bringing this action on behalf of the Company against the directors and officers who are responsible for the auction rate securities debacle.  The action is based on defendants' wrongful conduct during the period from July 1, 2007 to the present (the "Relevant Period").

**Auction Rate Securities**

4.       The action concerns auction rate securities ("ARS") marketed by Merrill during the

Relevant Period.  ARS are municipal bonds, corporate bonds, and preferred stocks with no fixed

rates of return, but whose rates of return are periodically re-set – typically every 7, 14, 28, or 35

days, but in some cases even daily – by an auction process.  ARS are usually issued with maturities

of 30 years, but the maturities can range from five years to perpetuity.  First developed in 1984, as of

today's date, the market for ARS has grown to well over $300 billion annually.

5.       ARS represented a large and lucrative portion of Merrill's Global Markets &

Investment Banking division, and the Company's overall profits depended substantially on its ability

to sell such securities to its corporate and institutional customers.

6.       The success of the ARS market at Merrill – on which Defendants' reputation and

bonuses was based – depended on the perception that the market was extremely liquid.  This is

because the primary target customers for ARS are investors with short-term investment goals or

cash-equivalent needs.  Any hint that the ARS market was not liquid had the potential to trigger a

massive sell-off by investors flocking to safer, more stable securities.  Thus, a failed auction, or even

the rumor of one, was a something that Defendants sought to avoid at all cost, even if it meant

steering the Company into an illegal course of action.

**Defendants' Illegal Course of Conduct**

7.       That is precisely what Defendants did.  Although the market for ARS had become

illiquid by mid-2007, Defendants – to protect the profits Merrill made on ARS and to enhance their

own positions and compensation – conspired to create the illusion that the market remained liquid.

Thus, Defendants caused Merrill to engage in various practices designed to "support" the market,

which they termed market "stabilization."  In reality, however, the conduct was nothing short of the type of market manipulation scheme that the securities laws have, for generations, prohibited.

8.     For example, Defendants caused Merrill to:  (a) take over its own customers' bid orders by filling in the blanks on open or market orders *after viewing other bidders' orders*; (b) bid for its own accounts without disclosing this fact to customers; (c) engage in a process of "netting" of customers' buy and sell orders so as to favor certain customers at the expense of others; (d) allow for rampant submission or revision of bids *after* the expiration of deadlines set by the ARS market; (e) collaborate with certain customers by asking them to bid at auctions and then compensating them in the secondary market with rates that were higher than the official clearing rate set at auction; (f) give inconsistent and contradictory indications to customers regarding the likely range at which particular auctions would clear.

9.     Despite Defendants' attempt to artificially prop up the ARS market at Merrill, the inherent illiquidity in the market soon overwhelmed Defendants' efforts.  By August 2007, more auctions were failing than succeeding.  Beginning at that point, Defendants decided to sell as many of the Company's ARS as they could onto unsuspecting customers – and thereafter to simply "walk away" from the ARS market.

10.     Defendants pursued this goal through yet more aggressive sales efforts ("Gotta Move those microwave ovens!!" wrote one sales head) and reassurances to investors, including consciously manipulating analysts in the Company's Research Department into providing favorable assessments and recommendations regarding the ARS sold by Merrill.  Throughout this process, Defendants acknowledged to one another in e-mails that "investors are freaking out" and the "market is collapsing."

11.    Particularly egregious was the manner in which Defendants co-opted Merrill's own supposedly independent Research Department to assist in sales efforts geared toward reducing the Company's inventory of ARS.  Defendants permitted managers in the Company's Global Sales & Trading department, including the Auction Trading Desk, to intimidate and pressure the Research Department in a number of ways.  Among other things, managers such as defendants Constable and Price were allowed, indeed encouraged, to:  (a) directly request and advocate for written research endorsing the safety and quality of ARS; (b) insist that previously published reports be retracted and replaced with more sales-friendly pieces; (c) monitor oral presentations by Research Department analysts during sales calls, and send e-mails and instant messages, *in real time*, instructing analysts to change the content of their remarks, avoid certain subjects, and "shut down" certain questioners; (d) communicate sensitive information concerning inventory levels, marketing initiatives, and enhanced sales incentives being offered to Financial Advisors ("FAs") in the field; and (e) directly influence the amount of bonuses received by analysts depending on the level of support that Sales & Trading had found that an analyst had provided to his or her "business partners" on the Auction Desk.

12.    The Research Department analysts, for their part, were only too willing to conform their behavior to the wishes of their bosses at Sales & Trading.  One analyst, defendant Conery, participated in a monthly conference call with FAs to discuss recent market events.  In discussing whether certain closed-end fund auctions were suspect or likely to fail, Conery hastened to reassure the FAs that the securities were "good, conservative, [and] reasonable."  Conery's remarks establish that, by this time, he had allowed himself to become simply a shill for the Auction Desk, in violation of his duties to the Company and its shareholders:

I will tell you Merrill Lynch, certainly by all indications, is committed to this product. I would have to let the desk people speak for themselves, but given the fact that through all this turmoil they continue to plod away, I think that shows that the firm is committed to it.

. . .

We are quite comfortable buying Aaa one month closed-end fund paper, whether its taxable or tax exempt we feel pretty good about it. But *I will be the first to say that the rumors out there flying are pretty wild or pretty amazing. If you listen to them all it would probably drive you nuts, because I know it's driving me nuts,* but you need to differentiate between what's rumor and what's fact. [Emphasis added.]

13.    By February 2008, Defendants had accomplished their goal. Thousands of investors, holding millions of dollars of ARS purchased from Merrill, were now left with highly illiquid, and essentially worthless, investments. As a result, the Company was now free to, and did, stop supporting the ARS market entirely.

14.    Defendants' efforts to conceal their market manipulation scheme were to no avail. After they had caused Merrill to "walk away" from the ARS market, the Company became the target of investigations by the SEC, the New York Office of the Attorney General, the Massachusetts Securities Division, and other state agencies. In an attempt to head off the investigations, Defendants thereupon caused Merrill to announce that it would buy back as much as **$12 billion** of auction-rate securities from about 30,000 retail clients, starting in January 2009. On August 15, 2008, New York Attorney General Andrew Cuomo announced that his office nonetheless would commence a criminal legal action against Merrill. Attorney General Cuomo termed the Company's offer to buy back ARS from customers "an inadequate response."

15.    Defendants' actions have caused untold harm to Merrill. The Company is exposed to tens of billions of dollars in losses, settlements, damages, and other liability that it would not otherwise have been exposed to. In addition, the Company faces irremediable damages to its

reputation from various investigations – including criminal investigations – by various state and federal agencies.

16.    Defendants' acts and omissions constituted material breaches of their fiduciary duties Merrill.  Throughout the Relevant Period, Defendants breached their fiduciary duties to shareholders and the Company, in the following ways, among others:

(a)    Deceptively marketing ARS to customers as highly liquid cash alternatives when, in fact, the ARS market was anything but liquid;

(b)    Failing to disclose that the ARS market was only "liquid" to the extent that Defendants had caused Merrill to *create* an artificial market for ARS;

(c)    Failing to disclose that they caused Merrill to purchase ARS for its own account to avert auction failures and that, but for these and other interventions, many auctions would have failed;

(d)    Manipulating the market for ARS by various methods and thereby exposing the Company to criminal and civil investigations and liability, as well as the obligation to repurchase ARS and maintain large inventories of ARS that now are essentially worthless;

(e)    Failing to implement or maintain adequate internal controls to ensure that the Company's transactions in ARS were legal, honest, and fair to customers;

(f)    Favoring issuer clients, to the disadvantage of investor clients, in setting lower-than-market default rates for ARS in the event of a failed auction;

(g)    Co-opting the Company's own supposedly independent Research Department into the cause of selling illiquid ARS to unsuspecting customers by any means possible,

including various practices of undue influence that violated federal law, industry standards, and the Company's own policies and procedures;

(h)    Creating and tolerating employee compensation systems that, among other things:  rewarded Sales & Trading and FA employees in proportion to the dollar amount of ARS sold to customers, regardless of the safety, liquidity, or suitability of those securities to customers; rewarded Research Analysts in proportion to the helpfulness of their supposedly objective reports in helping Sales & Trading and FA employees sell inventories of ARS to customers; and encouraged Research Analysts to conceal their true opinions concerning ARS and instead write flattering reports concerning ARS for consumption by investors;

(i)    Abruptly abandoning the ARS market after promising investors and the public to support it, leaving those investors stranded with billions of dollars in illiquid and worthless securities;

(j)    Making false and misleading statements to the Company's shareholders regarding the supposed liquidity of the ARS market, the integrity of the profits made by the Company from this market, the Company's exposure to losses from ARS, and the potential damages to the Company's reputation from Defendants' illegal practices;

(k)    Failing to create a separate Committee of the Board of Directors which would focus on the risks to the Company from its activities in various types of derivative securities, such as ARS, whose volatility or liquidity might create financial issues for the Company, its trading partners, or its customers, or damage its reputation;

(*l*)    Failing to maintain adequate minimum qualifications and standards for members of the various Committees of the Board to be able to serve on those Committees;

(m)    Paying themselves lavish salaries, bonuses, stock awards, and other compensation at a time when they had caused Merrill to face exposure in the tens of billions of dollars for their wrongdoing; and

(n)    enriching themselves at the expense of Merrill through their sale of Company stock based on material, non-public information.

17.    To remedy this systematic wrongdoing at Merrill, the Retirement System seeks relief in the name of the Company that, among other things, requires Defendants to pay damages to the Company to compensate it for its losses at their behest, requires Defendants to make restitution to the Company of the monies they caused it to transfer to them, and requires the Company itself to institute appropriate reforms to strengthen the Board's supervision of operations and strengthen the internal audit and control functions, so as to ensure that similar debacles do not recur.

## JURISDICTION AND VENUE

18.    This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1331, because of claims presenting federal questions arising under the Exchange Act, and pursuant to 28 U.S.C. § 1367(a) because all others claims are so related to claims presenting federal questions that they form part of the same case or controversy.  This Court also has jurisdiction over all claims asserted herein pursuant to 28 U.S.C. § 1332 in that, upon information and belief, complete diversity exists between the Retirement System and each of the Defendants and the amount in controversy exceeds $75,000.

19.    The Court has personal jurisdiction over each of the Defendants because each either is a corporation that conducts business in and maintains operations in this District or is an individual

with sufficient minimum contacts with this District as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

20.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because: (a) Merrill maintains its principal place of business here; (b) one or more of the Defendants either resides in or maintains executive offices here; (c) a substantial portion of the transactions and wrongs complained of herein occurred here; and (d) Defendants have received substantial compensation and other transfers of money here by doing business here and engaging in activities having an effect here.

## THE PARTIES

**Plaintiff**

21.     Plaintiff Retirement System is, and was during the Relevant Period, an owner and holder of the common stock of Merrill. The Retirement System is an instrumentality of the State of Louisiana and a resident thereof.

**Nominal Defendant**

22.     Nominal defendant Merrill is a leading global financial services company, with offices in 40 countries and territories and total client assets of approximately $1.6 trillion. The Company is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 222 Broadway, New York City, New York.

**Individual Defendants**

23.     Defendant John A. Thain ("Thain") has been the Chief Executive Officer of Merrill since December 2007 and Chairman of the Board of Directors of Merrill (the "Board") since 2007. In exchange for his purported trust, loyalty, and fidelity to Merrill, Thain in 2007 was paid over $17,300,000 in salaries, bonuses, fees, stock options, stock awards and other compensation. Since

January 1, 2007, Thain, based upon his knowledge of material, non-public information about the Company, has sold over $299,180 worth of Merrill stock.  Upon information and belief, Thain is a resident of New York.

24.     Defendant Carol T. Christ ("Christ") has been a member of the Board since 2007. She is a member of the Public Policy and Responsibility Committee of the Board.  In exchange for her purported trust, loyalty, and fidelity to Merrill, Christ in 2007 was paid over $191,000 in fees, stock awards and other compensation.  Upon information and belief, Christ is a resident of Massachusetts.

25.     Defendant Armando M. Codina ("Codina") has been a member of the Board since 2005.  He is Chair of the Nominating and Corporate Governance Committee of the Board, and a member of the Management Development and Compensation Committee.  In exchange for his purported trust, loyalty, and fidelity to Merrill, Codina in 2007 was paid over $270,000 in fees, stock awards and other compensation.  Upon information and belief, Codina is a resident of Florida.

26.     Defendant Judith Mayhew Jonas ("Jonas") has been a member of the Board since 2006.  She is a member of the Public Policy and Responsibility Committee and the Audit Committee of the Board.  In exchange for her purported trust, loyalty, and fidelity to Merrill, Jonas in 2007 was paid over $275,000 in fees, stock awards and other compensation.  Upon information and belief, Jonas is a resident of the United Kingdom.

27.     Defendant Virgis W. Colbert ("Colbert") has been a member of the Board since 2006.  He is a member of the Public Policy and Responsibility Committee, the Nominating and Corporate Governance Committee, and the Management Development and Compensation Committee of the Board.  In exchange for his purported trust, loyalty, and fidelity to Merrill, Colbert

in 2007 was paid over $261,000 in fees, stock awards and other compensation.  Upon information and belief, Colbert is a resident of Wisconsin.

28.    Defendant Alberto Cribiore ("Cribiore") has been a member of the Board since of Merrill since 2003.  He is a member of the Nominating and Corporate Governance Committee, the Management Development and Compensation Committee, and the Finance Committee of the Board. In exchange for his purported trust, loyalty, and fidelity to Merrill, Cribiore in 2007 was paid over $271,000 in fees, stock awards and other compensation.  Upon information and belief, Cribiore is a resident of New York.

29.    Defendant Aulana L. Peters ("Peters") has been a member of the Board since 1994. She is a member of the Public Policy and Responsibility Committee and the Management Development and Compensation Committee of the Board.  In exchange for her purported trust, loyalty, and fidelity to Merrill, Peters in 2007 was paid over $270,000 in fees, stock awards and other compensation.  Since January 1, 2007, Peters, based upon her knowledge of material, non-public information about the Company, has sold over $35,956 worth of Merrill stock.  Upon information and belief, Peters is a resident of California.

30.    Defendant Charles O. Rossotti ("Rossotti") has been a member of the Board since 2004.  He is Chairman of the Finance Committee and a member of the Audit Committee of the Board.  In exchange for his purported trust, loyalty, and fidelity to Merrill, Rossotti in 2007 was paid over $274,000 in fees, stock awards and other compensation.  Upon information and belief, Rossotti is a resident of Maryland.

31.    Defendant John D. Finnegan ("Finnegan") has been a member of the Board since 2004.  He is Chair of the Management Development and Compensation Committee, and a member

of the Finance Committee and the Nominating and Corporate Governance Committee of the Board. In exchange for his purported trust, loyalty, and fidelity to Merrill, Finnegan in 2007 was paid over $282,000 in fees, stock awards, and other compensation. Upon information and belief, Finnegan is a resident of New Jersey.

32.    Defendant Joseph W. Prueher ("Prueher") has been a member of the Board since 2001. He is Chair of the Public Policy and Responsibility Committee and a member of the Audit Committee of the Board. In exchange for his purported trust, loyalty, and fidelity to Merrill, Prueher in 2007 was paid over $278,000 in fees, stock awards, and other compensation. Since January 1, 2007, Prueher, based upon his knowledge of material, non-public information about the Company, has sold over $58,821 worth of Merrill stock. Upon information and belief, Prueher is a resident of Virginia.

33.    Defendant Ann N. Reese ("Reese") has been a member of the Board since 2004. She is Chair of the Audit Committee and a member of the Finance Committee of the Board. In exchange for her purported trust, loyalty, and fidelity to Merrill, Reese in 2007 was paid over $277,000 in fees, stock awards, and other compensation. Upon information and belief, Reese is a resident of New York.

34.    Until his "retirement" on October 30, 2007, Defendant E. Stanley O'Neal ("O'Neal") was the Chief Executive Officer of Merrill and the Chairman of its Board of Directors. In exchange for his purported trust, loyalty, and fidelity to Merrill, O'Neal in 2007 received over $24,300,000 in salaries, bonuses, fees, stock options, stock awards and other compensation. In 2006, O'Neal received over $91,375,000. In late 2007, O'Neal was granted a "retirement" package worth over $160 million. Since January 1, 2007, O'Neal, based upon his knowledge of material, non-

public information about the Company, O'Neal has sold over $44,546,000 worth of Merrill stock. Upon information and belief, O'Neal is a resident of New York.

35.    Defendant Nelson Chai ("Chai") has been the Executive Vice President and Chief Financial Officer of Merrill since December 10, 2007. Chai heads the Company's Risk Oversight Committee, a non-Board-level group. In exchange for his purported trust, loyalty, and fidelity to Merrill, Chai in 2007 was paid over $1,677,000 in salaries, bonuses, fees, stock options, stock awards and other compensation. Since January 1, 2007, Chai, based upon his knowledge of material, non-public information about the Company, has sold over $57,692 worth of Merrill stock. Upon information and belief, Chai is a resident of New York.

36.    Defendant Gregory J. Fleming ("Fleming") is the President and Chief Operating Officer of Merrill. In exchange for his purported trust, loyalty, and fidelity to Merrill, Fleming in 2007 was paid over $27,360,000 in salaries, bonuses, fees, stock options, stock awards and other compensation. In 2006, Fleming received over $33,880,000. Since January 1, 2007, Fleming, based upon his knowledge of material, non-public information about the Company, has sold over $11,497,639 worth of Merrill stock. Upon information and belief, Fleming is a resident of New York.

37.    Defendant Robert J. McCann ("McCann") is the Executive Vice President of Merrill. In exchange for his purported trust, loyalty, and fidelity to Merrill, McCann in 2007 was paid over $5,035,000 in salaries, bonuses, fees, stock options, stock awards and other compensation. In 2006, McCann received over $42,540,000. Since January 1, 2007, McCann, based upon his knowledge of material, non-public information about the Company, has sold over $14,611,446 worth of Merrill stock. Upon information and belief, McCann is a resident of New York.

38.     Defendant Peter S. Kraus ("Kraus") is the Executive Vice President of Merrill. Upon information and belief, Kraus is a resident of New York.

39.     Defendant Jeffrey N. Edwards ("Edwards") was the Chief Financial Officer of Merrill until December 7, 2007, when he was terminated.  However, Edwards remains on the payroll, "in a non-executive officer capacity."  In exchange for his purported trust, loyalty, and fidelity to Merrill, Edwards in 2007 was paid over $2,638,000 in salaries, bonuses, fees, stock options, stock awards and other compensation.  In 2006, Edwards received over $28,250,000.  Since January 1, 2007, Edwards, based upon his knowledge of material, non-public information about the Company, has sold over $2,867,000 worth of Merrill stock.  Upon information and belief, Edwards is a resident of New York.

40.     Defendant Eric Heaton ("Heaton") is the Treasurer of Merrill.  Upon information and belief, Heaton is a resident of New York.

41.     Defendant Ahmass L. Fakahany ("Fakahany") was the Co-President and Co-Chief Operating Officer of Merrill until his resignation on February 1, 2008.  In exchange for his purported trust, loyalty, and fidelity to Merrill, Fakahany in 2007 was paid over $4,582,0000 in salaries, bonuses, fees, stock options, stock awards and other compensation.  In 2006, Fakahany received over $50,850,000.  Since January 1, 2007, Fakahany, based upon his knowledge of material, non-public information about the Company, has sold over $19,169,006 worth of Merrill stock.  Upon information and belief, Fakahany is a resident of New York.

42.     Defendant Dow Kim ("Kim") was the Executive Vice President of Merrill until May 16, 2007, and served the Company in an advisory capacity until November 16, 2007, when he was terminated.  In exchange for his purported trust, loyalty, and fidelity to Merrill, Kim in 2007 was

paid over $14,482,0000 in salaries, bonuses, fees, stock options, stock awards and other compensation. In 2006, Kim received over $40,270,000. Since January 1, 2007, Kim, based upon his knowledge of material, non-public information about the Company, has sold over $26,575,000 worth of Merrill stock. Upon information and belief, Kim is a resident of New York.

43.     Defendant Thomas K. Montag ("Montag") is the Head of Global Sales & Trading for Merrill. Upon information and belief, Montag is a resident of New York.

44.     Defendant David Slobotka ("Slobotka") is the Senior Vice President, Head of Fixed Income Currency and Commodities Group, at Merrill. Upon information and belief, Slobotka is a resident of New York.

45.     Defendant Jeff Schultz ("Schultz") is the Chief Operating Officer, Fixed Income Currency and Commodities Group, at Merrill. Upon information and belief, Schultz is a resident of New York.

46.     Defendant Scott Brown ("Brown") is a Principal of the Fixed Income Currency and Commodities Group at Merrill. Upon information and belief, Brown is a resident of New York.

47.     Defendant Thomas J. Murray ("Murray") is the Director of Municipal Marketing at Merrill. Upon information and belief, Murray is a resident of New York.

48.     Defendant Frances W. Constable ("Constable") is a Managing Director of Merrill in charge of Merrill's ARS Trading Desk. Upon information and belief, Constable is a resident of New York.

49.     Defendant Martin Mauro ("Mauro") is a Fixed Income Strategist and Research Analyst at Merrill. Upon information and belief, Mauro is a resident of New York.

50.     Defendant Mary Rooney ("Rooney") is a senior analyst in the Research Department at Merrill.  Upon information and belief, Rooney is a resident of New York.

51.     Defendant Kevin J. Conery ("Conery") is the Senior Director Preferred Strategist in the Research Department at Merrill.  Upon information and belief, Conery is a resident of New York.

52.     Defendant John Price ("Price") is the Head of Americas Credit and Trading at Merrill.  Upon information and belief, Price is a resident of New York.

53.     Defendant Derek Sin ("Sin") is a trader on the Sales & Trading, Auction Desk, of Merrill.  Upon information and belief, Sin is a resident of New York.

54.     Defendant John Maier ("Maier") is a Closed End Fund Research Analyst in the Research Department of Merrill.  Upon information and belief, Maier is a resident of New York.

55.     Defendant Rosemary T. Berkery ("Berkery") is a Vice Chairman and General Counsel at Merrill.  Since January 1, 2007, Berkery, based upon her knowledge of material, non-public information about the Company, has sold over $22,814,443 worth of Merrill stock. Upon information and belief, Berkery is a resident of New York.

56.     The Defendants who served on Merrill's Board during the events complained of named in paragraphs 23-34 hereof are referred to as the "Director Defendants."  The Defendants who served as officers of the Company during the events complained of named in paragraphs 23 and 34-55, are referred to as the "Officer Defendants."  (There is some overlap between these two groups of Defendants.)

## DERIVATIVE ALLEGATIONS

57.    Plaintiffs bring this action derivatively in the right and for the benefit of Merrill to redress injuries suffered, and to be suffered, by Merrill as a direct result of the breaches of federal and state law, fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof, by the Defendants.  Merrill is named as a nominal defendant solely in a derivative capacity.   This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

58.    Plaintiffs will adequately and fairly represent the interests of Merrill in enforcing and prosecuting its rights.

59.    Plaintiffs are and were owners of the stock of Merrill during times relevant to the Defendants' wrongful course of conduct alleged herein, and remain shareholders of the Company.

60.    Prosecution of this action, independent of the current Board of Directors, is in the best interests of the Company.

## DEMAND FUTILE AND EXCUSED

61.    Demand upon the Board of Merrill that they institute this action in the company's name would be entirely futile, and is therefore excused.

62.    The Board of Merrill consists of eleven (11) individuals:  Defendants Thain, Christ, Codina, Jonas, Colbert, Cribiore, Peters, Rossotti, Finnegan, Prueher, and Reese.  A majority of these individuals are not disinterested and independent with respect to the acts and omissions alleged herein.  In fact, a majority, if not all, of the Board members face a substantial threat of personal liability, which compromises their ability to act impartially on a demand.  As detailed by *Forbes.com* in 2007:

Although it is O'Neal who is being held accountable, the board bears a fair measure of blame as well for not catching on to the firm's mushrooming exposure to potentially risky derivatives – amounting to $32 billion by the end of June just before the market started to crater.

63.     A majority of the Board members are not disinterested and independent, and face a substantial threat of personal liability, for the following additional reasons:

(a)     **Thain** is the Chief Executive Officer of Merrill, a high-level, highly-compensated executive office, and the Company has conceded that he is not independent under either the listing standards of the New York Stock Exchange or the Company's own director independence standards;

(b)     **Jonas, Prueher, Reese (Chair), and Rossotti** sit on the Audit Committee, which, through its failure of oversight, was directly responsible for allowing Merrill to defraud its own customers, manipulate the market for ARS, carry the ARS on the Company's books at an artificially inflated price, and expose the Company to tens of billions of dollars in damages;

(c)     **Finnegan** is the Chief Executive Officer of The Chubb Corporation, which is *both* a significant customer of, *and* a significant supplier to, Merrill.  This relationship is particularly troubling because Finnegan is Chair of the Management Development and Compensation Committee, which failed to prevent compensation to research analysts covering ARS representing an inherent conflict-of-interest for the Company and a violation of customers' trust, as well as failing to prevent lavish salaries, bonuses, stock awards, and other compensation to all Defendants;

(d)     **Christ, Jonas, and Reese** have barely two years' experience each as directors of Merrill.  Each has significantly less business experience in the brokerage and financial

products industry than their alleged peers on the Board: Christ most recently has been a university president and provost since 2000; Jonas has been chairman of the Royal Opera House and a fellow of Eton College Windsor since 2003; and Reese has headed the Center for Adoption Policy since 2001. Despite her lack of experience, Reese was even appointed the *Chair* of the Audit Committee. In these circumstances, these directors can be expected to be, and in fact are, dominated and controlled by one or more of the other directors, including Thain;

(e)     The **other directors** are dominated and controlled by Thain, who occupies the combined office of Chairman of the Board and Chief Executive Officer of the Company, who, unlike most of them, has spent decades in the financial services industry, and is in a position to influence the compensation and other benefits paid to the other directors, what committees they sit on, what role they will play in governance, and other features;

(f)     Based on their knowledge of material, non-public information, defendants **Chai, Edwards, Fakahany, Fleming, Dow, McCann, O'Neal, Peters, Prueher, Thain, and Berkery**, while in possession of material, non-public information regarding the Company's exposure to losses, settlements, and liability in the ARS market, sold almost **$142,532,183 million** in personal holdings of Merrill stock since January 1, 2007. These directors cannot be expected to objectively consider a demand that the Board take action against the Insider Selling Defendants or the other Defendants;

(g)     Certain directors play disproportionately large roles in the governance of Merrill, either because they sit on a majority of the committees of the Board or because they sit on more than one committee of which they chair at least one: **Colbert** (a majority of

committees); **Cribiore** (a majority of committees); and **Finnegan** (a majority of committees, plus chairing one committee);

(h)     Defendant **Thain** will take no action against the remainder of the Merrill Board, and they will take no action against him, because defendant Thain is the Chairman of the Board of Directors and is the Chief Executive Officer of the Company, and defendant Thain has dominated and now continues to dominate and control the Company as a result of his joint roles as the senior most executive officer and leading Board member of the Company;

(i)     The Director Defendants will take no action against one another or against any member of the Board because each member of the Board received *hundreds of thousands of dollars per year* just for serving on Merrill's Board and in compensation in exchange for their purported trust, loyalty and fidelity to Merrill.  Accordingly, Defendants will take no action against themselves or the other members of the Board of Directors of Merrill, because doing so would place compensation in jeopardy at least as follows: (i) over $17,300,000 million in salary, bonuses, fees, stock awards and other compensation paid to defendant **Thain** during 2007; (ii) over $191,000 in fees, stock awards and other compensation paid to defendant **Christ** during 2007; (iii) over $270,000 in fees, stock awards and other compensation paid to defendant **Codina** during 2007; over $275,000 in fees, stock awards and other compensation paid to defendant **Jonas** during 2007; over $261,000 in fees, stock awards and other compensation paid to defendant **Colbert** during 2007; over $271,000 in fees, stock awards and other compensation paid to defendant **Cribiore** during 2007; over $270,000 in fees, stock awards and other compensation paid to

defendant **Peters** during 2007; over $274,000 in fees, stock awards and other compensation paid to defendant **Rossotti** during 2007; over $282,000 in fees, stock awards and other compensation paid to defendant **Finnegan** during 2007; over $278,000 in fees, stock awards and other compensation paid to defendant **Prueher** during 2007; and over $277,000 in fees, stock awards and other compensation paid to defendant **Reese** during 2007;

(j)    As members of the Audit Committee, defendants **Reese (Chair), Jonas, Prueher, and Rossotti** will take no action against one another or the other members of the Board of Directors of the Company because each member of this Committee breached important specific duties outlined in the Committee's Charter and specified herein by, among other things:  failing to prevent the other Defendants and the Company from engaging in improper practices regarding ARS, including manipulation of the market for ARS, deception of customers, and the resulting exposure to government investigations, lawsuits, and the need to repurchase or otherwise carry tens of billions of dollars of essentially worthless ARS on the books of the Company; and causing or allowing Merrill to make materially false statements about the Company, its controls, procedures, risk of loss, the value of its assets and its financial position and accounting;

(k)    As members of the Finance Committee, defendants **Rossotti (Chair), Cribiore, Finnegan, and Reese** will take no action against one another or the other members of the Board of Directors of the Company because each member of this Committee breached important specific duties outlined in the Committee's Charter and specified herein by, among other things:  failing to prevent the other Defendants and the Company from engaging in improper practices regarding ARS, including manipulation of the market for

ARS, deception of customers, and the resulting exposure to government investigations, lawsuits, and the need to repurchase or otherwise carry tens of billions of dollars of essentially worthless ARS on the books of the Company; and causing or allowing Merrill to make materially false statements about the Company, its controls, procedures, risk of loss, the value of its assets and its financial position and accounting;

(*l*)    As members of the Management Development and Compensation Committee, defendants **Finnegan (Chair), Codina, Colbert, Cribiore, and Peters** will take no action against one another or the other members of the Board of Directors of the Company because each member of this Committee breached important specific duties outlined in the Committee's Charter and specified herein, by, among other things:  failing to prevent the other Defendants and the Company from engaging in improper practices regarding ARS, including manipulation of the market for ARS, deception of customers, and the resulting exposure to government investigations, lawsuits, and the need to repurchase or otherwise carry tens of billions of dollars of essentially worthless ARS on the books of the Company; failing to detect and override compensation to research analysts representing an inherent conflict-of-interest for the Company and a violation of customers' trust; failing to prevent an unearned "retirement" package worth over $160 million from being paid to defendant O'Neal; and causing or allowing Merrill to make materially false statements about the Company, its controls, procedures, risk of loss, the value of its assets and its financial position and accounting;

(m)    As members of the Nominating and Corporate Governance Committee, defendants **Codina (Chair), Colbert, Cribiore, and Finnegan** will take no action against

one another or the other members of the Board of Directors of the Company because each member of this Committee breached important specific duties outlined in the Committee's Charter and specified herein, by, among other things: failing to ensure that members of the various Committees of the Board met minimum standards to ensure the proper discharge of the Committees' responsibilities; failing to create or maintain a separate Committee of the Board charged with overseeing risk to the Company from derivative securities, such as ARS, whose volatility or liquidity might create financial issues for the Company, its trading partners, or its customers, or damage its reputation; failing to prevent the other Defendants and the Company from engaging in improper practices regarding ARS, including manipulation of the market for ARS, deception of customers, and the resulting exposure to government investigations, lawsuits, and the need to repurchase or otherwise carry tens of billions of dollars of essentially worthless ARS on the books of the Company; and by causing or allowing Merrill to make materially false statements about the Company, its controls, procedures, risk of loss, the value of its assets and its financial position and accounting;

(n)     As members of the Public Policy and Responsibility Committee, defendants **Prueher (Chair), Christ, Colbert, Jonas, and Peters** will take no action against one another or the other members of the Board of Directors of the Company because each member of this Committee breached important specific duties outlined in the Committee's Charter and specified herein, by, among other things:  failing to prevent the other Defendants and the Company from engaging in improper practices regarding ARS, including manipulation of the market for ARS, deception of customers, and the resulting exposure to

government investigations, lawsuits, and the need to repurchase or otherwise carry tens of billions of dollars of essentially worthless ARS on the books of the Company; and causing or allowing Merrill to make materially false statements about the Company, its controls, procedures, risk of loss, the value of its assets and its financial position and accounting;

(o)     Upon information and belief, each of the Director Defendants in late 2007 approved and authorized defendant O'Neal's "retirement" package, which was valued at more than *$160 million*.  This "retirement" package constituted corporate waste, given that O'Neal – unbeknownst to and without the permission of the Board – had recently contacted one of Merrill's primary competitors, Wachovia Bank, about a potential merger between the two companies (a move which would have caused an even higher severance payment to be paid to O'Neal and was, thus, entirely self interested).  Thus, the "retirement" package conferred upon O'Neal was given without consideration in that the Company could have, and should have, terminated O'Neal's employment for cause.  The Director Defendants' willingness to bestow such largesse upon O'Neal establishes their submission to him, their unwillingness to bring an action against him for the wrongs set forth herein, and their inability to be independent and disinterested with regard to those same wrongs;

(p)     With the exception of defendants Peters and Prueher, every person who was on the Board of Merrill when O'Neal was named Chairman and Chief Executive has since retired.  O'Neal has hand picked their successors.  As such, defendants **Thain, Christ, Codina, Colbert, Cribiore, Finnegan, Jonas, Reese, and Rossotti** are so beholden to O'Neal that they would not pursue an action against him; and

(q)    O'Neal has extremely close personal relationships with many of the Director Defendants such that they would not vote to pursue an action against him.  For example, *Forbes.com* reports that defendants **Finnegan** and O'Neal are long-time friends.  Likewise, press reports have described defendant **Cribiore** as close to O'Neal, and the *New York Times* has reported that in the late 1990s, Cribiore came close to recruiting O'Neal away for Merrill to work at Brera Capital.

64.    In addition, while Merrill and its public shareholders have suffered substantial damage and losses due to the deceit and deception committed by its insiders and the director oversight failings committed by its Board, the insiders and directors of this Company have not only suffered no damages but, in fact, have greatly profited from their participation in the illegal conduct. These individuals have usurped tens of millions of dollars of regular and bonus compensation, as well as severance payments, stock grants and stock awards as a result of their disloyal, incompetent performance and deceptive activities.

65.    As a result of their concealments and falsifications, many of the directors and managers of Merrill held onto their positions of power, prestige and profit at the Company.  Several – such as defendant O'Neal – were awarded termination payments in multiple tens of millions of dollars.

66.    The Merrill Board is still dominated and controlled by wrongdoers who continue to obscure their own misconduct and will not take action to protect the interests of Merrill or its shareholders.  The current Board of Directors of Merrill has refused, and will continue to refuse, to institute this action for the foregoing and following reasons:

(a)      The acts complained of herein constitute violations of fiduciary duties owed by the Board of Directors and these acts are incapable of ratification;

(b)      Certain of the known principal wrongdoers and beneficiaries of the wrongdoing complained of herein are in a position to, and do, dominate and control the Board of Directors.  Thus, the Board could not exercise independent objective judgment in deciding whether to bring or vigorously prosecute this action;

(c)      The acts complained of herein are illegal and improper and thus are acts incapable of ratification;

(d)      In order to bring this action for breach of fiduciary duty, abuse of control and fraud, the members of the Board of Directors would have been required to sue themselves and/or their fellow directors and allies in the top ranks of the Company, who are their good friends and with whom they have entangling financial alliances, interests, and dependencies, which they would not do.  They therefore would not be able to vigorously prosecute any such action;

(e)      The members of the Merrill Board, including each of the defendants herein, receive substantial salaries, bonuses, payments, benefits, and other emoluments by virtue of their membership on the Board and their control of Merrill.  They have thus benefited from the wrongs herein alleged and have engaged therein to preserve their positions of control and the perquisites thereof, and are incapable of exercising independent objective judgment in deciding whether to bring this action.  The Board members also have close personal or business ties with each other and are, consequently, interested parties and cannot in good

faith exercise independent business judgment to determine whether to bring this action against themselves; and

(f)    The Merrill directors' and officers' liability insurance policies for the relevant period have an "insured vs. insured" exclusion. Thus, if the directors caused the Company to sue its officers and directors for the liability asserted in this case they would not be insured for that liability. They will not do this to themselves or the officers they hired. The directors' and officers' liability insurance was purchased and paid for with corporate funds to protect the Company. This derivative suit does not trigger the "insured vs. insured" exclusion, and thus only this derivative suit can obtain a recovery on the directors' and officers' liability insurance and benefit the Company.

67.    In addition to the foregoing, the present Board of Directors of Merrill have refused, and will continue to refuse to institute this action because they face debilitating conflicts of interest as a result of their direct complicity in the actions complained of herein, the benefits that they received therefrom, and also as a result of their membership on committees of the Board directly responsible for oversight of the Company.

68.    Plaintiff has not made any demand on any shareholders of Merrill to institute this action since such demand would be a futile and useless act for the following reasons:

(a)    Merrill is a publicly traded company with approximately 1.5 billion shares outstanding that traded on the NYSE throughout the relevant period, which shares were held by thousands of shareholders located throughout the nation and abroad;

(b)     Making demand on such a number of shareholders would be impossible for plaintiff who has no way of finding out the names, addresses or telephone numbers of shareholders; and

(c)     Making demand on all shareholders would force plaintiff to incur huge expenses, assuming all shareholders could be individually identified.

## FACTUAL BACKGROUND

69.     Merrill is divided into two fundamental global businesses, Global Wealth Management ("GWM") and Global Markets & Investment Banking ("GMIB").  GWM covers the Company's vast network of customer investment accounts, ranging from the largest institutional accounts down to the smallest individual account.  GMIB, by contrast, provides institutional sales and trading, investment banking advisory, and capital raising services to corporations, governments, and other institutions around the world.

70.     GMIB comprises two primary divisions:  Global Equities, which provides equity (e.g., stock) sales and trading services; and the Fixed Income, Currencies and Commodities Group ("FICC"), which includes interest-rate, credit- and asset-based products, foreign exchange, commodities, derivatives, and other securities.  The ARS issued, sold, and marketed by Merrill were all transacted within the FICC.

### The ARS Market and the Existence of Control Deficiencies And Clear "Red Flags" About the Market's Safety and Liquidity

71.     ARS are securities which have no fixed rates of return, but whose rates of return are periodically re-set – typically every 7, 14, 28, or 35 days, but in some cases even daily – by an auction process.  ARS are usually issued with maturities of 30 years, but the maturities can range from five years to perpetuity.

72.     First developed in 1984, as of today's date, the market for ARS has grown to well over $300 billion annually.  Traditionally, the market was limited to institutional investors, but the minimum investment in ARS recently was reduced to $25,000, placing these securities within the reach of individual investors.

73.     ARS are auctioned at the "par" value – i.e., a specific dollar amount worth of securities.  The pricing variable consists of the interest rate or dividend yield that the auction process determines.  The rate or yield on any ARS is supposed to be set by a "Dutch" auction in which bids with successively higher rates are accepted until all of the securities in a particular auction are sold.

74.     Investors typically can submit only the following types of orders:

(a)     a "hold" order, which is the default order for current investors (i.e., the order that is entered for a current holder if the holder takes no action), where a current investor will keep the securities at the rate at which the auction clears;

(b)     a "hold-at-rate" bid, where a current investor will only keep the securities if the clearing rate is at or above the specified rate;

(c)     a "sell" order, where a current investor will sell the securities regardless of the clearing rate; or

(d)     a "buy" bid, where a prospective investor (or current investor who desires additional securities) will buy securities if the clearing rate is at or above the specified rate.

75.     As stated by disclosures documents (such as prospectuses) issued with respect to each ARS, an investor's order is irrevocable.  The final rate at which all of the securities are sold is the "clearing rate" that applies to all of the securities in the series until the next auction.  Bids with the

lowest rate and then successively higher bids are accepted until all of the sell orders are filled.  The clearing rate is the lowest rate bid sufficient to cover all of the securities for sale in the action.[1]

76.    If there are not enough bids to cover the securities for sale, then the auction fails, the issuer pays an above-market rate set by a pre-determined formula described in the disclosure documents, and all of the current holders continue to hold the securities, with some minor exceptions.  If all of the current holders of the security elect to hold their positions without bidding a particular rate, then the clearing rate, referred to as the "all-hold" rate, is a below-market rate set by a different formula.

77.    The issuer of each ARS selects one or more broker-dealers to underwrite the offering and/or manage the auction process.  Investors can only submit orders through the selected broker-dealers.  During the Relevant Period, Merrill was one of the largest broker-dealers participating in the ARS market.

78.    The issuer pays an annualized fee to each broker-dealer, such as Merrill, engaged to manage an auction.  The fee is typically 25 basis points (i.e., 25% of 1%) for the par value of the securities managed by that broker-dealer.

---

[1] Here is a simplified example of such an auction.  Suppose $75,000 par value of securities were for sale and the auction received four buy bids.  Bid 1 was for $25,000 at 3.05%.  Bid 2 was for $25,000 at 3.10%.  Bid 3 was for $35,000 at 3.10%.  Bid 4 was for $20,000.  In these circumstances, the "clearing rate" would be 3.10%, meaning all of the securities in the series would pay an interest rate (or yield, as the case may be) of 3.10% until the next auction.  Bid 1 would be allocated $25,000.  Bids 2 and 3 would receive pro-rata allocations of the remaining $50,000 worth of securities in proportion to the ratio of the par value bid for in each to the total par value bid for in both.  Bid 4 would receive nothing.

79.     The issuer also selects an auction agent to collect the orders and determine the clearing rate for the auction.  Investors must submit orders for an auction to the broker-dealer by a specified deadline.  Many broker-dealers have an internal deadline by which investors must submit their orders to them.

80.     This internal deadline allows the broker-dealer sufficient time to process and submit the orders to the auction agent.  Other broker-dealers allow investors to submit orders up to the submission deadline, i.e., the deadline for all broker-dealers to submit orders to the auction agent. The broker-dealers must submit the orders to the auction agent before the submission deadline, and usually must identify each separate order.

81.     After receiving the orders from the broker-dealers, the auction agent calculates the clearing rate that will apply until the next auction.  If there is only one broker-dealer, however, as was the case in many of the auctions managed by Merrill, the broker-dealer can discern the clearing rate before submitting orders to the auction agent.

82.     The auction agent allocates the securities to the broker-dealers based on the orders they submitted.  The auction procedures generally state that orders are filled in the following order: hold orders, hold-at-rate and buy bids with a rate below the clearing rate, hold-at-rate orders with a rate at the clearing rate, and buy bids with a rate at the clearing rate.

83.     When there are more bids for securities at the clearing rate than securities remaining for sale, the securities are allocated on a pro rata basis first to the hold-at-rate bidders and then to the buy bidders.  Generally, the auction procedures require broker-dealers to follow the same hierarchy in allocating the securities to their customers.

84.     From 1984 to 2006, the ARS market had grown to more than $200 billion annually, and the fees collected by the ten or so broker-dealers who dominated the market exceeded $600 million annually.

85.     The success of the ARS market at Merrill – on which Defendants' reputation and bonuses was based – depended on the perception that the market was extremely liquid.  This is because the primary target customers for ARS are investors with short-term investment goals or cash-equivalent needs.  Any hint that the ARS market was not liquid had the potential to trigger a massive sell-off by investors flocking to safer, more stable securities.  Thus, a failed auction, or even the rumor of one, was a something that Defendants sought to avoid at all cost, even if it meant steering the Company into an illegal course of action.

86.     In spite of this danger, in practice, the ARS auctions as a whole were not nearly liquid enough to support the billions of dollars' worth of these securities that broker-dealers such as Defendants caused Merrill to market to investors on a daily basis.

87.     It was in order to conceal the inherent illiquidity of the ARS market that Defendants and their counterparts at other broker-dealers caused Merrill and the other broker-dealers to engage in various practices designed to "support" the market, which they termed market "stabilization."  In reality, however, the conduct was nothing short of the type of market manipulation scheme that the securities laws have, for generations, proscribed.

88.     Indeed, in an administrative proceeding dated May 31, 2006, the SEC found that Merrill and other broker-dealers had engaged in various illegal practices in order to make it appear that the auctions were successful and legitimate when, in fact, they were not.  These actions, and the

SEC's finding, were the direct and foreseeable consequence of Defendants' having knowingly encouraged the practices in question.

89.     For example, broker-dealers such as Merrill were found to have routinely taken over their customers' bid orders by filling in the blanks on open or market orders *after viewing other bidders' orders.*  This practice allowed Merrill and other broker-dealers to bestow discounts on certain customers at the direct expense of other customers, and also allowed the broker-dealers to manipulate the clearing rate of the auction.

90.     In addition, broker-dealers could bid for their own accounts without disclosing this fact to customers, and the broker-dealers could ask their customers to change their orders, in both cases so as to allow the broker-dealer to:

(a)     prevent auctions from failing, thereby supporting the broker-dealers claim that the ARS market was very liquid and no auction had ever failed for want of orders; and

(b)     set artificial "market" rates, at levels essentially dictated solely by the broker-dealers themselves.

91.     The SEC also found that broker-dealers had rearranged bids through a process of "netting" of in-house buy and sell orders ahead of actual auctions in order to change the priority of bids.  Thus, before submitting bids to the auction agent, broker-dealers changed or "prioritized" their customers' bids to increase the likelihood that the bids would be filled.  As a result of this prioritization, as well as a similar practice known as "cross-trading," certain bids were secretly moved up in the disclosed hierarchy for the order in which bids of various types would be filled.  In many instances, these practices resulted in certain customers' bids displacing other customers' bids

when the auction was oversubscribed, which falsely affected the clearing rate, and did not conform to the disclosed procedures.

92.    The SEC also found that Merrill and other broker-dealers allowed the rampant submission or revision of bids after external and/or internal deadlines.  In addition, the broker-dealers themselves submitted or revised bids after these deadlines.  These practices favored investors or the broker-dealers who bid after a deadline by displacing other investors' bids, affected the clearing rate, and did not conform to the disclosed procedures.

93.    The SEC also found that broker-dealers such as Merrill had collaborated with certain of their customers by asking them to bid at auctions and then compensating in the secondary market with rates that were higher than the clearing rate on the auction itself.  For example, certain broker-dealers persuaded customers to submit bids at lower rates than the customers actually wanted to receive, allowing the auction to clear at the lower rate, buying the securities from the investor after the auction at the clearing rate, and then selling the securities back to the investor at the same rate but below par value.  Some broker-dealers did not even trouble themselves to convince customers to submit a "straw man" bid and, instead, simply displaced those customers' bids and then sold them securities at below par value in the secondary market.  Also, some broker-dealers provided higher returns to certain customers by delaying settlement dates for those customers.

94.    Finally, the SEC found that certain broker-dealers provided different "price talks"[2] to different customers, placing certain customers at an advantage over others at the expense of the others.

_____

[2] Price talk is a broker-dealer's estimate of the likely range within which an auction will clear.

95.     The SEC's findings demonstrated that Defendants, and their counterparts at other broker-dealers, had caused ARS auctions to be auctions in name only and, in fact, were an illegal market made and manipulated by the broker-dealers themselves.  As a consequence of Defendants' and others' knowingly encouragement of these practices, fifteen broker-dealers, including Merrill, were fined $13 million, censured by the SEC, and ordered to cease and desist from those practices. Merrill was sentenced to a civil penalty of $1,500,000.

96.     The abuses found by the SEC were not the only ones present in the ARS market at Merrill.  Another abuse that came to light later was that the terms of ARS were structured in a manner that precluded secondary market value in the event of an auction failure.  Maximum rates, those interest rates that would be applied in the event of an auction failure, were set at low levels which were favorable to issuer clients of Merrill, but in the case of broad auction failures, provided issuers with little or no incentive to seek alternative financing in order to redeem the ARS shares.

97.     The establishment of low maximum rates directly contributed to issuer clients' efforts in successfully obtaining AAA ratings for their securities from credit rating agencies.  And indeed, Defendants stressed the AAA ratings of the Company's ARS in their marketing efforts, billing them as ultra conservative investments.  But when Defendants caused Merrill to stop supporting its auctions, investors came to realize that the low maximum rate which had allowed the securities to receive an AAA rating rendering their holdings unmarketable and illiquid.

98.     On the investor side, interest rates were not high enough to compensate interested investors for their increased liquidity risk.  Defendants had no incentive to negotiate for higher maximum rates to balance the market interests, *because the Company was collecting significant underwriting fees from issuers at the outset on the investment banking side.*  In fact, Merrill reaped a

total of approximately $90 million in profits from its ARS program in 2006 and 2007 alone. Thus, Defendants, by working the investment banking side, had a significant interest in keeping the Company's issuer clients happy in order to maximize Defendants' own personal bonuses and other compensation.

99.    Defendants, by causing Merrill to have a dual role in representing both issuers and investors purchasing ARS, created significant and inherent conflicts of interest which could not be reconciled – placing the Company in violation of its own standards, the standards applicable to the securities industry, and federal and state law.

100.    Despite the fines and cease-and-desist orders imposed by the SEC, Defendants knowingly caused Merrill to continue to engage in various practices, including those set forth above, to artificially bolster the auction markets, exposing the Company to greatly enhanced criminal and civil liability.

101.    Indeed, despite their conscious awareness of the growing illiquidity in the ARS market, Defendants knowingly caused Merrill to sell ARS to unsuspecting customers without warning those customers of the risks.

**After 2007, Defendants Abandon the Auction Market, and It Collapses**

102.    In 2007, a credit crisis of unprecedented levels swept across the United States economy that continues to roil the nation's financial markets.

103.    By the middle of 2007, banks had stopped financing private equity deals, the prices of U.S. residential real estate had gone into a steep decline, and the mortgage market for sub prime borrowers had essentially shut down. The collapse of the credit markets forced financial institutions such as Merrill to report tens of billions of dollars in losses and write downs. The collapse also

began to infect the ARS market.  Merrill was especially hard hit and was forced to seek additional capital infusions quickly.

104.    By the middle of 2007, the demand for ARS by Merrill's corporate and institutional clients essentially dried up.  This shift was driven, in large part, by a March 2007 decision by the Financial Accounting Standards Board ("FASB") requiring ARS to be listed on investors' balance sheets as "short-term investments" rather than "cash equivalents."  Corporate investors responded to this by disposing of their ARS so that their balance sheet cash positions would not be reduced as result of the FASB decision, and their liquidity ratings would not suffer.  As a consequence, Merrill was forced to retain more ARS inventory on its books than it could financially handle.

105.    Despite these developments, Defendants struggled to maintain the illusion of a healthy and liquid market for these securities at Merrill.

106.    Thus, rather than disclose the weakening demand for ARS, Defendants caused Merrill to *market ARS to customers even more intensely as a liquid cash alternative*.  Indeed, Defendants caused Merrill to represent such securities expressly as "money market and auction instruments" in the Company's monthly account statements to customers.

107.    Defendants engaged in this conduct, among other reasons, so that Merrill could unload millions of dollars in ARS that the Company had in its inventory to its own customers before those securities became essentially worthless.

108.    By August 16, 2007, several monthly auctions had failed amidst the turmoil in the credit markets.  Investors did not show to bid in auctions that month for about 60 auctions worth $6 billion of ARS.  Also, some credit ratings agencies were advising that "they would not be surprised to see further failed auctions in the days or weeks ahead."

109.    Thereafter, auctions began failing with regularity, and those few that did succeed would have failed but for the intervention of Merrill and the other broker-dealers themselves. Defendants caused Merrill to continue to intervene so as to prop up the auction market by bidding with knowledge of other bids, by submitting bids after the internal bidding deadlines imposed on investors, and by directly or indirectly influencing or setting the clearing rates. In short, despite their awareness that there was, in fact, no legitimate auction demand for ARS, Defendants continued to actively market and sell ARS as a liquid cash alternative, exposing the Company to irremediable damage to its reputation and millions of dollars in civil and criminal penalties.

110.    Then, after unloading as many ARS as they could from Merrill's inventory onto unsuspecting customers, Defendants directed Merrill to stop supporting auctions altogether and simply "walk away" from the ARS market.

111.    Thus, on February 13, 2008, 87 percent of the auctions for ARS failed when Merrill and other broker-dealers were caused by Defendants and their counterparts to pull the plug. Thousands of investors, holding millions of dollars of ARS purchased from Merrill, were now left with highly illiquid, and essentially worthless, investments.

**Defendants Aggressively Market ARS to Investors as Safe and
Incentivize Sales Professionals to Move as Much ARS Inventory as Possible**

112.    Defendants worked aggressively throughout the Relevant Period to market ARS to unsuspecting Merrill customers as safe and liquid securities.

113.    Thus, after the first hint of investor concern with the ARS market, Defendants immediately mobilized to counteract any negative news. Defendant Constable and other managers, for example, moved quickly to set up sales calls to provide assurances to the Company's FAs and to motivate future sales of ARS.

114.    The sales calls were successful.  In an e-mail to defendant Price on the evening of August 15, 2007, in a report titled, "[B]eware the Ides of August," Constable tracked the pending ARS inventory and commented:

> Noteworthy:  Didn't hear of any failed auctions today.  WHEW!!  Retail salesforce comforted with my brief call on [Global Private Client] National sales call at noon and in depth discussion and Q&A on the auction markets with Kevin Conery and Jon Maier.

115.    In the Q&A call conducted on August 15, 2007, which was well attended with over 200 listeners, defendant Conery stated that the "turmoil, confusion, fear in the auction market" should be viewed "*ultimately as a positive, especially for the [Global Private Client] system*" and "*that we view it as an opportunity.*"  (Emphasis added.)  Conery further advised FAs:  "And we suggest that you take advantage of this to the extent you can."

116.    In late November 2007, Defendants and other risk management personnel at Merrill reviewed the Auction Desk's growing inventory of ARS and implemented a reduction plan, which they referred to as a "Balance Sheet Initiative."

117.    On November 26, 2007, defendant Constable told an associate in an e-mail that Merrill had to slash prices to sell its inventory of ARS:  "The gloves are off and we are not concerned about issuer perception of [Merrill's] abilities and the competition.  *Gotta Move those microwave ovens!!*"  (Emphasis added.)

118.    On November 30, 2007, defendant Constable wrote another colleague:  "It is *critical for the sales force to know that management is behind these products as they represent the best products for bringing new cash into the firm.*"  (Emphasis added.)

119.    On a national sales call on December 12, 2007, defendants Constable and Conery were joined by defendant Thomas J. Murray, the Director of Municipal Marketing at Merrill.

Referring to recent "dislocations" in the ARS market, Murray addressed the pitch that FAs should make to customers concerning ARS: "*Anything that is being mentioned here is really because there's a real opportunity here. Nothing is being suggested with the idea of a fire-sale approach. The idea is because it's good for the customer.*" (Emphasis added.)

120.    Defendant Conery's comments on the sales call consisted of similar soft pedaling. For example, Conery stated that the recent pressure on the ARS market since August simply "made things that were already attractive even more attractive."

121.    Defendant Constable attended the same sales call and said she wanted to address "a couple of specific opportunities in the auction area." She continued:

> I just want to give you a couple of quick bullet points, point out some relative value, and then *reassure everyone that we are working in concert with research to provide the best ideas and to give assurance as to the solidity and ongoing endurance of some terrific markets.* [Emphasis added.]

122.    Defendant Constable referenced a slide presentation that was provided to all the call participants, which "give[s] you some background and should help you present to your sales force in the offices there of why *these should be considered a great cash management gathering tool.*" (Emphasis added.)

123.    During the call, defendant Constable noted that corporations at year end "sort of . . . maybe [are] stepping to the sidelines or maybe are taking their existing cash and looking for opportunities, so this is the time to encourage them to come in because rates have never been more attractive."

124.    Defendant Constable reminded listeners during the call that "[w]e have research supporting our recommendations and the value of this marketplace, so you should feel very confident that this is a great place to put your investors at this time."

125.    During these various calls, there was no discussion regarding the risk of any type of auction failure, or the possibility that any market dislocation could result in a customer's cash becoming illiquid.  There was no discussion about the possibility that Defendants could decide at any time to stop Merrill's support of the ARS market or otherwise withdraw from supporting the auctions that it managed.  There was no mention of the fact that with the pressures that existed in the credit markets since August 2007, any auction failure by any auction dealer could spread contagion to the rest of the market.

126.    Instead, the ARS sales staff's comments were muted, in concert with the wishes of all Defendants, to minimize any risk associated with ARS and instead focus only on potential positives to assist in Defendants' organized sales campaign to reduce the Company's inventory positions and risks of loss, without regard to the impact on customers.

127.    Defendants supplemented these efforts throughout the second half of 2007 with enhanced production credits (i.e., sales incentives) to FAs selling ARS as a means of motivating them to sell ARS to customers and reduce Merrill's inventory.  During periods when enhanced credits were awarded, FAs earned 100 basis points per par value of ARS sold to customers – an eight-fold increase from the normal 12.5 basis-point incentive.

128.    Defendant Constable led the charge in using enhanced credits to motivate FAs.  She stressed the importance of this technique to Defendants' sales efforts, even though they had come under some criticism:

> We are of course being criticized for our 25, 50 and 100 bp extra pcs.  Stu Wexler came around with the text of an email that he wants to send out to all Fas *which I am convinced would be our death knell if it goes out.*  We need to sit down before anything is sent and determine what part of our market is bullet proof and beyond the scope of any type of failure, which should be the bulk of what we trade and decide if

it is so unsuitable for us to use sales credits as incentives.  I am near the end of my rope on this line of thinking.  [Emphasis added.]

### Despite Assurances to Investors, Defendants Were Well Aware of the Illiquidity in the ARS Market

129.    Despite reassuring customers that the ARS market remained a vibrant and healthy one, Defendants were well aware that the market, in fact, was illiquid.  By no later than August 2007, ARS auctions had begun to fail, putting Defendants on notice of the inherent problems and abuses in the ARS market at Merrill.

130.    In response to the problems, various FAs began sending in increasingly critical questions to the Global Markets & Investment Banking staff managing the Company's Auction Trading Desk.

131.    In August 2007, for example, a Merrill FA in Chicago, Illinois, asked Constable about the "disconnect" in the "current yields" and requested that the Auction Desk "share the rationale behind the dislocation" to handle "uncertainty w/clients."  Many such e-mails were relayed from others to Constable.  One member of the Global Bank Group wrote defendant Constable:  "Hi Frances – I'm getting a few of these types of questions from [FAs].  Do you want to give me some talking points so I can try to answer them?  I'm sure you guys are getting inundated on the desk."

132.    On August 21, 2007, defendant Constable e-mailed a colleague in the Financial Products group requesting that a group of individuals be formed to address "[FAs] and investors about the intrinsic value and stability of auction market securities, particularly now when rates are high and *investors are freaking out.*"  (Emphasis added.)

133.    Negative headlines concerning sub-prime mortgage concerns, asset-backed securities, and other derivative instruments caused great anxiety for Constable and Merrill's Auction Desk and were treated as though each and every story alone could topple the auction market.

134.    For instance, in September 2007, the Auction Desk was forwarded an e-mail from a Merrill FA who received a worried e-mail inquiry from a customer.  The customer had attached a recent investor alert announcement concerning ARS issued by SVB Asset Management, a competing brokerage firm.  The notice spoke of volatility in the ARS market, as well as "challenges stemming from a lack of market liquidity."

135.    Defendant Derek Sin, an Auction Desk trader, forwarded the e-mail to Auction Desk personnel with the statement "HERE WE GO …IT BEGINS . . . .  Constable forwarded the e-mail chain to Conery, stating:  "SVB back in our face!!  Can Capital Advisors be far behind?"

136.    On August 16, 2007, referring to the Auction Trading Desk, defendant Constable wrote an e-mail to a research professional in a different firm about the state of the ARS markets:

> Come on down and visit us in the vomitorium!!  Thanks for the piece though.  We will be sure to provide it to all those holders who, according to the article, are likely to get caught up in this latest round of likely "fails."  Ouch.

137.    The previous week, on August 9, 2007, defendant Constable had e-mailed another person:  "Markets are shutting down bit by bit.  We have 5 failed auctions so far, with three more likely today."

138.    Market conditions continued to worsen for ARS in the fall of 2007 – a fact which Defendants continued to conceal from investors.  On November 19, 2007, for example, defendant Price confided in one personal e-mail:

> Thanks… Will call later.  Market is collapsing.  No more $2k dinners at CRU!  The
> Financials are being inviverated! [sic]  More firings over at Citi…Inventory flooding
> the street.  Going to be a great '08 trading environment.  All we have to do is live!

139.    On November 21, 2007, defendant Constable e-mailed defendant Price and others and
reported the extremely difficult time the Auction Desk had in successfully completing the auctions
for the day.  Wrote Constable:

> Auction Market inventory at [close of business] 11/21/2007 was reflective of a
> double auction day when the market conducted over 1400 auctions, *a scarcity of*
> *investors to snap up cheaply priced inventory and the ongoing negative perception of*
> *securities that populate the auction market* and the behavior of dealer participants.
> *Any combination of* a negative Bloomberg article about auction illiquidity, the
> ongoing downdraft of press about the monocline insurers that guarantee the entire
> municipal space in our market, equity prices of the dealer community and the GSEs
> undergoing a death spiral undermining retail investors confidence in our ability to
> support the auction business and two times the number of daily auctions *might have*
> *been deadly but we got them all today.*  [Emphasis added.]

140.    And, in a supreme irony (given that state's regulatory action later filed against
Merrill), Defendants in late 2007 or early 2008 specifically warned the Commonwealth of
Massachusetts, as an issuer client of the Company, that the ARS markets were in trouble and that the
state should consider refinancing some of its debt.  Unfortunately, of course, this information was
not shared with smaller state entities or individual investors.

141.    Defendants' knowledge of the likelihood of failure of the ARS market is also
established by the fact that, toward the end of the Relevant Period, Defendants purposefully lowered
the penalty rate applicable to auction failures.  This move – which negatively impacted the value of
ARS to customers – was taken knowing that Merrill might well have to pay, or share in, the
penalties.

142.    These privately held opinions of Defendants were in stark contrast to the aggressive public sales and marketing campaign touting the safety and quality of the auction market securities that Defendants caused the Company to promote to its sales staff and investors.

### To Sell Inventories of ARS, Defendants
### Manipulate the Company's Supposedly Independent Research

143.    Throughout the Relevant Period, Defendants caused Merrill's ARS sales and trading departments to pressure Merrill's own research analysts, who are supposed to offer neutral advice to customers on behalf of the Company, to *redact or rewrite any reports that did not portray ARS positively.*  For example, on August 21, 2007, defendant Mauro, a fixed-income research analyst, issued a research comparing ARS unfavorably to other derivative products sold by Merrill.  Upon reading Mauro's report, defendant Constable immediately called Mauro and demanded a retraction and a clarification of the report, which she later alleged could "SINGLE HANDEDLY UNDERMINE THE AUCTION MARKET."  At the direction of defendant Price, Mauro's report was rewritten by defendant Conery, adopting the changes demanded by Constable.  The new report alerted investors to "a buying opportunity for investors who are looking for short-term instruments."

144.    Defendant Mauro's experience with defendant Constable had lasting effects on defendant Conery and others in the Research Department.  In January 2008, after completing some suggested changes in a draft research report, Conery asked defendant Maier, a fellow Research Department analyst, to have someone else review his suggested changes before publishing the report:

> I'd really appreciate you showing this to Marty [Mauro] before hand.  *I want to make sure that research cannot be accused of causing a run on the auction desk, like was the case in August.  I think we have sufficiently covered that risk, but would like his thoughts.*  [Emphasis added.]

145.    Defendants Conery and Mauro also understood that their research reports would be scrutinized by the Auction Desk and, abandoning their professional responsibilities, they sought and relished the Desk's approval.  On December 7, 2007, Conery emailed Mauro and another Research Department employee:  "FYI, I was at the [Institutional Advisory Division] holiday party last night.  Got some glowing comments on the auction market report from such people as Frances Constable and Doug Mellert . . . ."

146.    At other times, Auction Desk personnel attempted to directly influence how the Research Department responded to questions from Merrill FAs during sales calls.  In one instance in August 2007, defendant Conery was answering questions from a FA.  Defendant Constable had dialed in to the call and was listening in.   After one question was asked, which was not to Constable's liking, she e-mailed or instant-messaged Conery as follows:  "*Shut this guy down. Suggest he call outside the call.  He is focusing attention away from your positive message.*" (Emphasis added.)

147.    Defendant Conery himself viewed his responsibilities as helping Defendants unload illiquid ARS on unsuspecting customers.  At the request of his supervisor, defendant Rooney, Conery offered input for purposes of his year-end performance review.  In a written communication to Rooney, Conery highlighted his service to the Auction Desk, stating, in part:  "auction market – integral and well coordinated with the auction desk . . . A large number of conference[s] helped to significantly improve liquidity and lower inventory levels."  In the wake of his performance review, Conery was awarded a six-figure bonus for 2007.  In Conery's review, Rooney specifically noted:

> Kevin worked closely with *his business partners* to communicate key issues facing a rather opaque market place.  *Here he engaged in proactive and timely interchange with sales, and corporate cash clients, and GPC.  Ultimately, his work contributed to better liquidity and lower inventory levels in the marketplace.*  [Emphasis added.]

148.    Defendants' manipulation of research personnel had a direct impact on their ability to sell illiquid ARS to unsuspecting customers – to the detriment of those customers.  On January 28, 2008, defendant Conery joined an Institutional Advisory Division sales representative in a conference call with one of the representative's corporate clients.  Conery made positive remarks about ARS which prompted a glowing e-mail endorsement from the representative to defendant Constable:  "Our clients now feel they have a much better understanding of the issues, and are reassured about their investments in [ARS]."  Later, after Defendants caused Merrill to abandon the ARS market, in a Form 10-Q filed with the SEC, a company with the same name as the one referenced in the e-mail reported holding over $110 million in illiquid ARS and an impairment charge related to the securities of over $5 million.

### Defendants' Manipulation of the ARS Market And Deceit of Customers Has Had a Ruinous Effect on Merrill

149.    The cost of this debacle to Merrill has been profound.  After Defendants had caused Merrill to "walk away" from the ARS market, the Company became the target of investigations by the SEC, the New York Office of the Attorney General, and other state agencies.  In response, on August 7, 2008, Defendants caused Merrill to announce that it would buy back as much as **$12 billion** of auction-rate securities from about 30,000 retail clients, starting in January 2009.

150.    Nonetheless, on July 31, 2008, the Enforcement Division of the Massachusetts Securities Division of the Office of the Secretary of the Commonwealth filed an Administrative Complaint against Merrill.

151.    In its complaint, the Enforcement Division cited dozens of internal communications at Merrill (many of which are cited above) demonstrating unequivocally that Defendants were aware that the ARS auction market process was flawed and the market would eventually fail.

152.    In particular, the Enforcement Division cited evidence that Merrill's internal risk management departments insisted that the Company reduce its ARS inventory, and that Defendants thereupon caused the Company to embark on a "campaign to unload" its ARS holdings on its retail investment clients through highly deceptive marketing practices.

153.    The Enforcement Division sought an order requiring Merrill to cease and desist from all future violations, pay an administrative fine, and offer rescission of sales of ARS at par (or restitution to investors who already sold their ARS below par).

154.    On August 15, 2008, New York Attorney General Andrew Cuomo announced that his office would commence a criminal legal action against Merrill, calling the Company's offer to buy back ARS from customers "an inadequate response."

155.    The import of these developments is that Defendants have caused Merrill to maintain inventories of ARS in the par amount of **at least $12 billion** that are drastically diminished in value, if not worthless.

156.    Moreover, even Merrill makes restitution to some or all ARS investors, the Company is still exposed to potentially ruinous lawsuits from investors claiming that they suffered additional damages – as well as *issuer* customers of Merrill (i.e., the parties on behalf of whom ARS were issued as a debt instrument in the first place), who will sue because they are now forced to pay much higher interest rates on those securities than they would be paying if traditional, fixed-rate bonds had been issued instead.

**MATERIALLY FALSE AND MISLEADING
STATEMENTS REGARDING DEFENDANTS'
MANIPULATION OF THE ARS MARKET AND THE IMPACT ON MERRILL**

157.    Throughout the Relevant Period, Defendants issued public statements about the financial condition of Merrill that were false because they omitted to disclose the burgeoning Company's burgeoning exposure to losses on its inventories of ARS.  Thus, while they were deceiving the Company's own customers, manipulating the market for ARS, and, by February 2008, unloading billions of dollars in illiquid ARS on unsuspecting investors, Defendants knowingly concealed from shareholders the fact that most of the ARS in its inventories were illiquid, unmarketable, and essentially worthless, knowingly failed to take necessary write downs on those securities, and knowingly exposed the Company to billions of dollars in liability for settlements and lawsuits arising from their fraudulent practices.  Thus, from at least July 1, 2007 to August 7, 2008, each of Defendants' statements about the financial results of the Company were materially misleading, and Defendants knew or consciously disregarded this fact.

158.    On April 19, 2007, although Defendants' conscious manipulation of the ARS market and exposure of the Company to losses in the tens of billions of dollars was well under way, Defendants caused the company to issue a press release announcing its results for the first quarter of 2007 to the public, including shareholders.  Defendants announced "record revenues" from the Company's Fixed Income, Currencies and Commodities Group ("FICC"), which includes the Company's ARS activities.  Net revenues Company-wide were $9.9 billion, up 24 percent for the prior-year period.  Defendant O'Neal, then Merrill's CEO, was quoted as saying that "[o]ur product capabilities and geographic reach are stronger and broader now than at any point in our history, and

we continue to make investments to further enhance our franchise.  We remain focused on disciplined growth to capitalize on the positive secular trends we continue to see unfold."

159.    Concerning FICC, Defendants were especially positive:  "Fixed Income, Currencies and Commodities (FICC) net revenues increased 36% to a record $2.8 billion driven by nearly every major revenue category, as revenues from credit products, real estate, interest rate products and currencies grew to record levels."

160.    The press release and Form 10-Q covering first-quarter 2007 results were was false and misleading in that Defendants did not breathe one word concerning the inherent illiquidity of the ARS market on which FICC's fortunes in part depended, or Defendants' manipulation thereof, or the Company's multi-billion exposure thereto.  This act constituted a deliberate, material omission of the fact that Merrill was exposed to tens of billions of dollars in ARS losses, write downs, and settlements.

161.    On May 14, 2007, defendants Fleming and Kim gave a presentation to the UBS 2007 Financial Services Conference.  In their presentation, Fleming and Kim highlighted Merrill's transition away from "traditional" sources of profit, such as mergers and acquisitions, equity and debt capital markets, and leveraged finance, toward newer, "non-traditional" avenues, such as derivatives, commodities, structured finance, principal risk taking, and private equity.  Defendants painted a highly optimistic picture of the Company and its future profitability from derivatives, which included ARS.

162.    The presentation was false and misleading in that Defendants did not breathe one word concerning the inherent illiquidity of the ARS market on which FICC's fortunes in part depended, or Defendants' manipulation thereof, or the Company's multi-billion exposure thereto.

This act constituted a deliberate, material omission of the fact that Merrill was exposed to tens of billions of dollars in ARS losses, write downs, and settlements.

163.    On October 24, 2007, Defendants caused the Company to issue a press release announcing its results for the third quarter of 2007 to the public, including shareholders.  Defendants announced an overall loss of $2.3 billion from continuing operations.  This loss reportedly resulted in large part from $7.9 billion in write downs in collateralized debt obligations and other securities linked to the U.S. subprime mortgage market.  FICC also experienced lowered revenues, but this reportedly was due to write downs of non-ARS securities.  Defendants hastened to reassure investors that:

> The net losses related to [the non-ARS securities] were limited through aggressive and effective risk management, including disciplined and selective underwriting and exposure reductions through syndication, sales and transaction restructurings. Other FICC business reported strong results with record net revenues in interest rates and currencies and solid results in commodities and commercial real estate.

164.    The press release and Form 10-Q covering third-quarter 2007 results were was false and misleading in that Defendants did not breathe one word concerning the inherent illiquidity of the ARS market on which FICC's fortunes in part depended, or Defendants' manipulation thereof, or the Company's multi-billion exposure thereto.  This act constituted a deliberate, material omission of the fact that Merrill was exposed to tens of billions of dollars in ARS losses, write downs, and settlements.

165.    On January 17, 2008, Defendants caused the company to issue a press release announcing its results for the fourth quarter and full year 2007 to the public, including shareholders.  Defendants announced a full-year net loss from continuing operations of $8.6 billion.  Revenues at FICC were negative $15.2 billion, reportedly due to additional losses in subprime-mortgage-related

assets. Again, however, Defendants stressed the positive impact on FICC revenues from Rates and Currencies, which included ARS. In fact, Rates and Currencies were described as having enjoyed "record full year net revenues." These results were confirmed in the Company Form 10-K filed on February 25, 2008 with the SEC and made publicly available.

166.    The press release and Form 10-K covering fourth-quarter and full-year 2007 results were false and misleading in that Defendants did not breathe one word concerning the inherent illiquidity of the ARS market on which FICC's fortunes in part depended, or Defendants' manipulation thereof, or the Company's multi-billion exposure thereto. This act constituted a deliberate, material omission of the fact that Merrill was exposed to tens of billions of dollars in ARS losses, write downs, and settlements.

167.    On January 30, 2008, defendant Thain gave a presentation to the Citigroup 2008 Financial Services Conference. In his presentation, Thain stressed the fact that Merrill had a "healthy core franchise," was "[w]ell-positioned for 08 with strong liquidity and enhanced capital position," and had a "Firm-first approach led by a strengthened management team." Thain painted a highly optimistic picture of the Company and its future profitability from derivatives, which included ARS.

168.    The presentation was false and misleading in that Defendants did not breathe one word concerning the inherent illiquidity of the ARS market on which FICC's fortunes in part depended, or Defendants' manipulation thereof, or the Company's multi-billion exposure thereto. This act constituted a deliberate, material omission of the fact that Merrill was exposed to tens of billions of dollars in ARS losses, write downs, and settlements.

169.    On February 6, 2008, defendant Fleming gave a presentation to the Credit Suisse 2008 Financial Services Forum.  In his presentation, Fleming reiterated the points that Merrill had a "healthy core franchise," was "[w]ell-positioned for 08 with strong liquidity and enhanced capital position," and had a "Firm-first approach led by a strengthened management team."

170.    Defendant Fleming touted the Company's ability to assess and manage risk:

**Risk Management Remains Critically Important**

- New co-heads with substantial experience

- Direct reporting lines to CEO

- One combined market and credit risk group

- Weekly risk meetings

- Re-aligning organization to better fit business and market environment

- Re-oriented compensation philosophy to "firm results first"

171.    Defendant Fleming painted a highly optimistic picture of the Company and its future profitability from derivatives, which included ARS.

172.    The presentation was false and misleading in that Defendants did not breathe one word concerning the inherent illiquidity of the ARS market on which FICC's fortunes in part depended, or Defendants' manipulation thereof, or the Company's multi-billion exposure thereto. This act constituted a deliberate, material omission of the fact that Merrill was exposed to tens of billions of dollars in ARS losses, write downs, and settlements.

173.    On May 12, 2008, defendants Chai and Heaton gave a presentation to the UBS 2008 Global Financial Services Conference.  In their presentation, Chai and Heaton reiterated the points that Merrill had a "healthy core franchise," was "[w]ell-positioned for 08 with strong liquidity and

enhanced capital position," and had a "Firm-first approach led by a strengthened management team." In addition, they stressed the Company's "unique and diversified business model." Chai and Heaton painted a highly optimistic picture of the Company and its future profitability from derivatives, which included ARS.

174.    The presentation was false and misleading in that Defendants did not breathe one word concerning the inherent illiquidity of the ARS market on which FICC's fortunes in part depended, or Defendants' manipulation thereof, or the Company's multi-billion exposure thereto. This act constituted a deliberate, material omission of the fact that Merrill was exposed to tens of billions of dollars in ARS losses, write downs, and settlements.

175.    On July 17, 2008, Defendants caused the company to issue a press release announcing its results for the second quarter of 2008 to the public, including shareholders. Defendants announced a net loss from continuing operations of $4.6 billion. Revenues at FICC were negative $8.1 billion for the quarter, due yet again to additional losses in subprime-mortgage-related assets. Again, however, Defendants stressed the positive impact on FICC revenues from Rates and Currencies, which included ARS. In fact, Rates and Currencies were described as having enjoyed "strong revenues" for the quarter. These results were confirmed in the Company Form 10-Q filed on August 5, 2008 with the SEC and made publicly available.

176.    The press release and Form 10-Q covering second-quarter 2008 results were false and misleading in that Defendants did not breathe one word concerning the illiquidity of the ARS market on which FICC's fortunes in part depended, or Defendants' manipulation thereof, or the Company's multi-billion exposure thereto. This act constituted a deliberate, material omission of the fact that Merrill was exposed to tens of billions of dollars in ARS losses, write downs, and settlements.

## THE TRUTH IS BELATEDLY DISCLOSED

177.    The truth concerning Defendants' deliberate misstatements and omissions to shareholders only began to emerge on August 7, 2008, when Defendants, desperate to avoid a criminal indictment, announced that they would cause Merrill to offer to buy back **$12 billion** worth of securities.

## INSIDER SELLING

178.    Between January 1, 2007 and the present, during the height of Defendants' deception of customers in, and manipulation of, the ARS market and the aftermath of these actions, defendants **Chai, Edwards, Fakahany, Fleming, Dow, McCann, O'Neal, Peters, Prueher, Thain, and Berkery** (the "Insider Selling Defendants"), while in possession of material, non-public information regarding the Company's exposure to losses, settlements, and liability in the ARS market, sold almost **$142,532,183 million** in Merrill stock on the basis of their inside information.

179.    Each of the Insider Selling Defendants sold stock in the amounts set forth in paragraphs 23, 29, 32, 34-37, 39, 41, 42, and 55, *supra.*

180.    The sales by the Insider Selling Defendants constituted a breach of their fiduciary duties to the Company.  In addition, it violated Merrill's corporate policy as contained in the Code of Ethics.

## ADDITIONAL BREACHES OF FIDUCIARY
## DUTIES AND GROSS MISMANAGEMENT

181.    The Defendants breached their duties of loyalty and good faith by allowing or causing the Company to misrepresent its financial results and prospects, as detailed herein, and by failing to prevent illegal actions related to the misrepresentation.

182.    As set forth above, Defendants had a duty to Merrill that the Company's financial reporting fairly presented, in all material respects, the operations and financial condition of the Company.   In order to adequately carry out this duty, it is and was necessary for the Defendants to know and understand the material, non-public information to be either disclosed or omitted from the Company's public statements.  Here, this material, non-public information included: (i) the fact that the Company was taking advantage of investors and customers in its ARS line of business and manipulating the market for these securities; and (ii) the fact that the Company's financial statements were materially misstated due to, among other things, Defendants' failure to properly value, and discount, the ARS in its portfolio due to their inherent illiquidity.

183.    Furthermore, the Director Defendants, as members of the respective committees of the Board, had special duties that included knowing and understanding the material information as set out in the charters of each of the respective committees, which provides that each committee's responsibilities include: (i) overseeing evaluation of the Company's internal accounting controls; (ii) reviewing the Company's financial reports and accounting standards and principles; and (iii) overseeing internal audits.  It was also the duty and responsibility of the Audit Committee to communicate the results of its exercise of reasonable judgment to the full Board of Directors and for the full Board to ultimately monitor and oversee the Audit itself.

184.    The Officer Defendants had ample opportunity to discuss this material information with their fellow officers at management meetings and via internal corporate documents and reports.  Moreover, the Director Defendants had a duty to discuss this material information with management and fellow directors at any of the Board's meetings or at any of the meeting of the committees of the Board.

185.    The Defendants' conduct as set forth herein constituted conscious misbehavior and recklessness.  Each of the Officer Defendants was charged with overseeing the risk, valuation, and integrity of the Company's loan portfolios and capital position, and each of the Director Defendants was not only responsible for the Company's financial well-being as a whole but also sat on one or more committees of the Board specifically requiring him or her to be actively involved in the oversight of the officers managing the Company's portfolio:  (a) Jonas, Prueher, Reese (Chair), and Rossotti (Audit Committee); (b) Cribiore, Finnegan, Reese, and Rossotti (Chair) (Finance Committee); (c) Codina, Colbert, Cribiore, Finnegan (Chair), and Peters (Management Development and Compensation Committee; (d) Codina (Chair), Colbert, Cribiore, Finnegan (Nominating and Corporate Governance Committee); and (e) Christ, Colbert, Jonas, Peters, and Prueher (Chair) (Public Policy and Responsibility Committee).  The Board and each of these Committees did, in fact, actively direct and control the Company's affairs during the Relevant Period.  In 2007, the full Board met 12 times, the Audit Committee met 11 times, the Finance Committee met 12 times, the Management Development and Compensation Committee met 13 times, the Nominating and Corporate Governance Committee met 7 times, and the Public Policy and Responsibility Committee met 3 times.

## ADDITIONAL DAMAGES TO MERRILL AND SHAREHOLDERS

186.    As a result of Defendants' illegal actions and course of conduct during the Relevant Period, the Company is now subject to drastically increased costs, both of operating in the normal course, and of satisfying extraordinary obligations incurred as a result of Defendants' malfeasance. Such expenditures include, but are not limited to:

(a)     costs incurred in connection with the investigation by the Enforcement Section of the Massachusetts Securities Division, as well as by the New York Attorney General;

(b)     costs incurred in connection with the investigation by the SEC;

(c)     costs incurred in connection with the investigation by other state and/or federal agencies;

(d)     costs incurred in connection with defending investor class actions related to Defendants' manipulation of the market for ARS, expected to exceed tens or hundreds of millions of dollars in legal fees and settlement costs;

(e)     costs incurred to correct the Company's internal control procedures to remediate material weaknesses in the Company's pricing, offering, valuation, sales, trading, and marketing of ARS, as well as the integrity of the division between its Research Department and its sales and trading departments;

(f)     increased costs of capital as a result of a lowered share price and a balance sheet encumbered by billions of dollars of illiquid ARS that the Company should never have acquired in the first place;

(g)     potentially tens of millions of dollars in settlements to satisfy adverse judgments and/or potential fines in connection with other government investigations;

(h)     costs incurred from increased Directors and Officers' Insurance ("D&O Insurance") premiums as a result of the manipulation of the ARS market;

(i)     costs incurred from potential losses of large trading partners who do not want to be associated with brokerages that improperly manipulate markets for securities they sell

to customers, improperly fuse their Research and Sales & Trading operations; and lie about the liquidity of the securities they sell and their willingness to support the market for those securities; and

(j)    costs of downgrades of Merrill's debt and securities by financial analysts and creditors, due to concerns about the accuracy and integrity of the Company's financial practices and reporting.

187.    The Defendants' actions have irreparably damaged Merrill's corporate image and goodwill.

## DEFENDANTS' DUTIES

188.    Defendants had stringent duties to Merrill and its shareholders.  These duties arose by operation of law and were imposed upon them by the Company, by virtue of their positions at the Company.

### Duties at Law

189.    By reason of their positions as officers, directors, and/or fiduciaries of Merrill and because of their ability to control the business and corporate affairs of Merrill, the Defendants owed Merrill and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Merrill in a fair, just, honest and equitable manner.  The Defendants were and are required to act in furtherance of the best interests of Merrill and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

190.    Each director and officer of the Company owes to Merrill and its shareholders the fiduciary duty to exercise good faith, loyalty, and diligence in the administration of the affairs of the

Company and in the use and preservation of its property and assets, and to uphold the highest obligations of fair dealing.  In addition, as officers and/or directors of a publicly held company, the Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's revenue, margins, operations, performance, management, projections and forecasts so that the market price of the Company's stock would be based on truthful and accurate information. In order to adequately carry out these duties, it is necessary for the Defendants to know and understand the material, non-public information should be either disclosed or not disclosed in the Company's public statements.

191.    The Defendants, because of their positions of control and authority as directors and/or officers of Merrill, were able to, and did, exercise control over the wrongful acts complained of herein and over the contents of the various public statements issued by the Company.  Because of their advisory, executive, managerial and directorial positions with Merrill, each of the Defendants had access to adverse, non-public information about the financial condition, operations, and improper representations of Merrill.

192.    To discharge their duties, the officers and directors of Merrill were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of Merrill were required to, among other things:

(i)    refrain from acting in any manner so as to favor the personal interest of the Directors or Officers of the Company at the expense of the best interest of the Company and its shareholders;

(ii)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate information to shareholders, the investing public, and the SEC;

(iii)     conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the Company's value;

(iv)     properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(v)     ensure that management was conducting legal, fair, and honest transactions with customers, and was not employing artifices or manipulations to maintain so-called "liquid" markets in securities, including ARS, that were not, in fact, liquid;

(vi)     ensure that financial records and asset values were true, accurate and reliable and that such values reflected the real (even if impaired) value of such assets, including ARS;

(vii)     remain informed as to how Merrill conducted its operations, and, upon receipt or notice of information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws;

(viii)    ensure that the Company was operated in a diligent, honest and prudent manner in compliance with all applicable federal, state and local laws, rules and regulations;

(ix)    ensure that sufficient checks and balances in Merrill's accounting and finance functions, and related functions, were strong enough to prevent accounting irregularities, internal-controls problems, misevaluation of ARS, manipulation of customer orders for ARS, and deception regarding ARS;

(x)    ensure that no inaccurate financial information about Merrill was released to the public that would tend to artificially inflate Merrill's stock, and that would thus cause corresponding or greater harm to the Company's value when the truth was revealed; and

(xi)    ensure that valuable corporate assets would not be wasted in payments of excessive bonus payments to executives who ruined the financial health and stability of the Company.

193.    Each Defendant, by virtue of his or her position as a director and/or officer of Merrill, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Merrill, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders.

194.    The Defendants were aware, or should have been aware, that those violations, absences of good faith, and the reckless disregard of duties posed a risk of serious injury to the Company.  The conduct of the Defendants who were also officers and/or directors of the Company

during the relevant period has been ratified by the remaining Defendants who collectively comprised all of Merrill's Board during the relevant period.

## Corporate Duties

195.    Throughout the Relevant Period, Defendants emphasized the Company's commitment to the highest standards of ethical business conduct.

196.    The Company had a comprehensive Code of Ethics for Directors, Officers and Employees (the "Code of Ethics").  The Code of Ethics provided, among other things, as follows:

> Merrill Lynch's reputation for integrity in the marketplace is one of it's [sic] most important – and potentially most fragile assets.  Every director, officer and employee bears an important responsibility to safeguard this reputation with clients, colleagues, shareholders, regulators and the general public by adhering to high professional standards and key principles of business conduct.
>
> . . .
>
> Success in our business is only possible with the trust and respect of our clients. Since no set of policies and procedures can be all encompassing, we must always conduct ourselves in a way that reflects positively on our company by putting the interests of our clients and the entire firm first.
>
> . . .
>
> **Fair Dealing**
>
> **Every Merrill Lynch person must deal fairly with Merrill Lynch's clients, vendors, competitors and fellow employees.**
>
> Merrill Lynch seeks to excel and outperform our competitors honestly and fairly. Competitive advantage must result from superior performance, not unethical or illegal business dealings.
>
> . . .
>
> **Compliance with Internal Controls**
>
> Merrill Lynch maintains and enforces a strong, effective system of internal controls to safeguard and preserve the information and assets of our company, our clients and

our shareholders. These controls are designed to ensure that business transactions are properly authorized and carried out, and that all reporting is truthful and accurate. These administrative and accounting systems are the responsibility of each group in the Merrill Lynch organization.

. . .

Transactions must be properly reflected on the company's books and records. Every employee is involved, if not in the authorization or execution of business transactions, in some level of reporting. This may include reporting travel and entertainment expenses or recording work hours on a timecard. It is important that all reporting be done honesty and accurately and that employees cooperate fully with both internal and independent audits.

. . .

**Compliance With Law**

**Knowing, respect and comply with all laws, rules and regulations applicable to the conduct of Merrill Lynch's businesses.**

Merrill Lynch actively promotes compliance with the laws, rules and regulations that govern our company's business. Obeying both the letter and the spirit of the law is one of the foundations of Merrill Lynch's ethical standards.

Employees must obey the laws of all the states and countries in which Merrill Lynch operates. While no employee is expected to be an expert on every detail of all the laws that govern the firm's business in every jurisdiction, they are expected to understand the laws and regulations applicable to their duties well enough to know when to seek advice from their manager or from the Office of General Counsel. To that end, all employees are required to complete the training programs that are deemed by management to be mandatory, including the course entitled "The Way We Do Business".

. . .

**Insider Trading**

Merrill Lynch policy prohibits Merrill Lynch persons from acting upon material non-public information to benefit themselves or others. Information is "material" if there is a substantial likelihood that a reasonable investor would consider it important in making an investment decision, or it could reasonably be expected to affect the price of an issuer's securities. Any employee in receipt of material or potentially material information should notify the Office of General Counsel as soon as practicable.

. . .

Those having access to confidential or nonpublic information must not use or share that information except in connection with the legitimate conduct of Merrill Lynch's business. Merrill Lynch strives to prevent the misuse of material non-public information by, among other things, limiting access to confidential information and limiting and monitoring communications between areas that regularly receive non-public information and the company's sales, research trading areas, and asset management. In addition to civil and criminal penalties, misuse of confidential information or engaging in insider trading will result in disciplinary action, including possible termination.

. . .

**Proper Record-Keeping and Disclosure Requirements**

Merrill Lynch requires honest and accurate accounting and recording of financial and other information in order to make responsible business decisions and provide an accurate account of our company's performance to shareholders and regulators. It is a violation of law and Merrill Lynch policy for any Merrill Lynch person to attempt to improperly influence or mislead any accountant engaged in preparing our audit. The firm is committed to full compliance with all requirements applicable to its public disclosures, and requires that its financial and other reporting fairly present the financial condition, results of operations and cash flow of our company and comply in all respects with applicable law, governmental rules and regulations, including generally accepted accounting principles (GAAP) and applicable rules of the U.S. Securities and Exchange Commission (SEC) and other market and banking regulators.

Merrill Lynch has implemented disclosure controls and procedures (including establishment of a Disclosure Committee) to ensure that its public disclosures are timely, compliant and otherwise full, fair, accurate and understandable. Employees responsible for preparing Merrill Lynch's public disclosures, or providing information as part of this process, are responsible for ensuring that such disclosures and information are complete, accurate and in compliance with Merrill Lynch's disclosure controls and procedures.

. . .

**Conclusion**

**Use good judgment.**

These *Guidelines for Business Conduct* provide specific guidelines for ethical conduct in broad areas of concern. It would be impossible to describe every situation in which a Merrill Lynch person might be confronted with an ethical dilemma. Everyone must take the time to think about the ethical ramifications of questionable situation, bearing in mind that a bad ethical decision may lead to improper or even criminal behavior.

The Office of General Counsel is available to assist with business conduct and ethical issues that give you concern. Nevertheless, in many instances, you must rely on your own personal ethical standards in assessing difficult situations. Consider the following questions:

> Is the proposed action legal?

> Does it endanger anyone's financial stability, life, health or safety?

> Is it consistent with Merrill Lynch policy?

> Will it enhance the company's reputation?

> Would we lose clients if this action were known to them?

> Would you like to see it become a general industry or public practice?

> Would you be embarrassed if the details were known by your manager, peers, subordinates, family or friends, or if they were published in a newspaper?

> Could this action in any way be interpreted as, or appear to be, inappropriate behavior?

> What would you think of your manager, peers or subordinates if any of them behaved similarly?

> Does the action you are considering make you feel uncomfortable? Are you compromising your own personal ethics in any way?

. . .

**Merrill Lynch Principles**

**Integrity**
No one's personal bottom line is more important than the reputation of our company.
**At Merrill Lynch, our goal is to:**

> Exemplify the highest standards of personal and professional ethics in all aspects of our business.

> Be honest and open at all times.

Stand up for one's convictions and accept responsibility for one's own mistakes.

Comply fully with the letter and spirit of the laws, rules and practices that govern Merrill Lynch and its activities around the world.

Demonstrate consistency between one's words and actions.

. . .

**Client Focus**
The client is the driving force behind what we do.  **At Merrill Lynch, our goal is to act in ways that help us to:**

Understand the client by anticipating and responding to client needs.

Fulfill client expectations without compromising the integrity of Merrill Lynch.

Provide value-added advice and guidance by analyzing client needs and resolving issues.

Provide the broadest range and highest quality of products and services, which are easy for clients to use.

Develop and maintain long-term relationships by actively listening to clients in order to build trust and loyalty.

Offer personal and individual service.

Use the company's technology to best serve the changing needs of clients.

Through teamwork, leverage our capabilities and resources to fully meet the needs of our clients.

197.    Moreover, Merrill adopted a Financial Code of Conduct for all its financial professionals, including Defendants, as follows:

"Financial Professional" means any professional employee in the area of finance (including core and business finance, accounting, and financial reporting), corporate audit, corporate risk management, corporate tax, investor relations or treasury, and also includes the Chief Executive Officer ("CEO"), Chief Financial Officer ("CFO"), Controller, the Head of each of the major business segments of the Company, and any member of Executive Management who has similar operating or oversight responsibilities regardless of such person's designated title.

The Company's *Guidelines for Business Conduct: Merrill Lynch's Code of Ethics for Directors, Officers and Employees* ("Guidelines for Business Conduct") sets forth the fundamental principles and key policies and procedures that govern the conduct of all of the Company's directors, officers and employees. Financial Professionals are required to conduct their personal and professional affairs in a manner that is consistent with the ethical and professional standards set forth in the Guidelines for Business Conduct, as well as this supplemental Code of Ethics.

All Financial Professionals must:

1. Engage in and promote honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships;

2. Take all reasonable measures to protect the confidentiality of non-public information about Merrill Lynch or any subsidiary and Merrill Lynch customers obtained or developed in connection with their activities, and to prevent the unauthorized disclosure of such information unless required by applicable law or regulation or legal or regulatory process;

3. Produce full, fair, accurate, timely and understandable disclosure, in compliance with applicable accounting standards, in reports and documents that Merrill Lynch or any subsidiary files with, or submits to, the U.S. Securities and Exchange Commission or any applicable regulatory body and in other public communications made by Merrill Lynch or any subsidiary;

4. Act in good faith, responsibly, with due care, competence, prudence and diligence, without misrepresenting material facts or allowing one's independent judgment or decisions to be subordinated;

5. Comply with governmental laws, rules and regulations, as well as rules and regulations of self-regulatory organizations applicable to Merrill Lynch, its subsidiaries, and their respective businesses; and

6. Promptly bring to the attention of the Disclosure Committee of the Company and to senior management any information he or she may have concerning (i) significant or material deficiencies or weaknesses in the design or operation of the Company's internal controls, (ii) any fraud, whether or not material, or any actual or apparent conflict of interest between personal and professional relationships, involving any member of management or other employee who has a significant role in the Company's financial reporting, disclosures or internal controls, or (iii) any other matters which could have a material adverse effect on the Company's ability to record, process, summarize and report financial data.

Financial Professionals shall facilitate the work of the Company's independent public auditors and shall not, directly or indirectly, take any action to fraudulently influence, coerce, manipulate or mislead Merrill Lynch's independent public auditors.

Each Financial Professional is accountable for his or her adherence to this Code of Ethics and the Company's policies. Any violation of this Code of Ethics may result in disciplinary action, including immediate dismissal.

Any Financial Professional who believes, in the exercise of reasonable judgment after a review of the facts, that a violation of this Code of Ethics has occurred shall promptly report such violation to the General Counsel of Corporate Law and to the Head of Corporate Audit. In the alternative, reports of violations of this Code of Ethics and auditing or accounting related concerns may be made confidentially and anonymously through the Ethics Hotline as set forth in the Guidelines for Business Conduct.

Merrill Lynch policy prohibits retaliation against an employee who reports a violation of this Code of Ethics in good faith. As provided by law, Merrill Lynch is not permitted to fire, demote, suspend, harass or discriminate against an employee in retaliation for such employee providing information to, or otherwise assisting or participating in, any investigation or proceeding by a regulatory or law enforcement agency, any member of the U.S. Congress or a Congressional committee, or by the Company, relating to what the employee reasonably believes is a violation of the securities laws, an act of fraud or a violation of any wage or discrimination laws. No Merrill Lynch director, officer, employee or representative is permitted to take any such retaliatory action.

198.    In addition, Merrill adopted corporate "Governance Guidelines" to ensure the faithful fulfillment of the codes of conduct and the duties of officers and directors:

1. Director Qualifications and Board Composition

A. Independence

The Board of Directors will consist of a majority of non-employee directors who meet the criteria for independence contained in the rules of the New York Stock Exchange ("NYSE") and any other applicable regulations. The Board will monitor its compliance with the regulations related to director independence on an ongoing basis. Each independent director shall notify the Chairman of the Nominating and Corporate Governance Committee, as soon as practicable, in the event that his or her circumstances change in a manner that may affect the Board's evaluation of his or her independence.

B. Director Qualifications

The Nominating and Corporate Governance Committee has established Board Candidate Guidelines that set forth criteria that are considered in evaluating the candidacy of an individual as a member of the Board. The Board Candidate Guidelines are attached to these Corporate Governance Guidelines as Exhibit A. The Nominating and Corporate Governance Committee will periodically review the Board Candidate Guidelines and modify them as appropriate. The Nominating and Corporate Governance Committee is responsible for identifying, screening and recommending to the Board candidates for membership on the Board of Directors. Final approval of any candidate shall be determined by the full Board of Directors.

C. Voting for Directors

In an uncontested election, a nominee must receive more votes cast *for* than *against* his or her election in order to be elected to the Board. Any incumbent Director who is a nominee for re-election and who receives more votes cast *against* than votes cast for his or her election, shall promptly tender his or her resignation to the Board of Directors following certification of the shareholder vote.

The Nominating and Corporate Governance Committee will make a recommendation to the Board of Directors as to whether to accept or reject the tendered resignation, or whether other action should be taken. The Board of Directors will act on the tendered resignation, taking into account the Nominating and Corporate Governance Committee's recommendation, and will publicly disclose (by a press release, a filing with the Securities and Exchange Commission or other broadly disseminated means of communication) its decision regarding the tendered resignation and the rationale behind the decision, within 90 days of the certification of the election results. The Nominating and Corporate Governance Committee, in making its recommendation, and the Board of Directors, in making its decision, may each take into account any factors or other information that it considers appropriate and relevant. A Director who tenders his or her resignation will not participate in the recommendation of the Nominating and Corporate Governance Committee or the decision of the Board of Directors with respect to his or her resignation. If the tendered resignation is not accepted by the Board of Directors, the Director shall continue to serve as a director until a successor is duly elected and qualified.

D. Board Size

The size of the Board of Directors is determined to achieve an effective working group that may vary in number from time to time depending upon the needs of the Corporation. The Nominating and Corporate Governance Committee will assess the size of the Board of Directors from time to time to determine whether its size continues to be appropriate.

E. Lead Independent Director

The Board has established the position of Lead Independent Director of the Board of Directors. The Lead Independent Director shall be an independent director elected by the Board of Directors who shall: (i) preside at all Board meetings when the Chairman is not present and establish the agendas for executive sessions with input from the other directors, (ii) serve as a liaison between the independent directors and the Chairman in matters relating to the Board as a whole (although all independent directors are encouraged to freely communicate with the Chairman and other members of management at any time); (iii) call meetings of the independent directors, as appropriate; and (iv) be available, at reasonable times and intervals, for consultation and direct communication from shareholders.

F. Retirement

It is the policy of the Corporation that a non-employee director shall not serve as a director beyond the Annual Meeting of Shareholders held in the calendar year next following such director's seventy-second birthday. Under the Corporation's current policy, directors, who are also employees of the Corporation, retire from the Board at the same time they retire as an employee of the Corporation or its affiliate.

G. Term Limits

The Board of Directors does not believe it is advisable to establish term limits for its members as such limits may deprive the Corporation and its shareholders of the contribution of directors who have been able to develop, over time, valuable insights into the Corporation, its operations and future. As part of its responsibilities, the Nominating and Corporate Governance Committee will consider each director's continuation on the Board at the expiration of his or her term and recommend to the Board whether such director should be considered for re-election.

H. Other Directorships

To ensure that directors have sufficient time to properly discharge their duties, directors are expected to seek the approval of the Nominating and Corporate Governance Committee prior to joining the board of any public company. To promote compliance with the Merrill Lynch Director Independence Standards, directors are also requested to notify the General Counsel prior to joining the board of any private company or charitable institution.

I. Change in Director's Present Job Responsibilities

In the event of a material change in a director's qualifications or status, such as a change in employment, he or she is required to offer to resign from the Board. The

Nominating and Corporate Governance Committee will review the desirability of the director's continued service on the Board in light of the changed responsibilities or circumstances and will make a recommendation to the Board as to whether or not to accept the offer of resignation, which shall become effective only upon acceptance by the Board of Directors.

2. Director Responsibilities

A. Board's Role

The business and affairs of the Corporation are managed under the direction of the Board, which represents and is accountable to the shareholders of the Corporation. The Board focuses its activities on the key requirements of the Corporation, such as corporate strategy, evaluation of the performance of the Chief Executive Officer, succession planning and business practices. The basic responsibility of the directors is to exercise their business judgment to act in what they reasonably believe to be the best interest of the Corporation and its shareholders. In discharging that obligation, directors, in exercising their business judgment, are entitled to rely on the Corporation's management and outside advisors and auditors. The Corporation has purchased and seeks to maintain reasonable directors' and officers' liability insurance on their behalf. In addition, the directors receive the benefits of indemnification to the fullest extent permitted by Delaware law.

B. Board Meetings

The Board of Directors currently holds regularly scheduled meetings and calls for special meetings as necessary. Any meeting of the Board may be held telephonically. Directors are expected to make every effort to attend, in person, all regularly scheduled Board meetings and meetings of the Committees of the Board on which they serve, other than special purpose meetings that are organized as telephonic meetings. They are also expected to devote the necessary time, including participation in special meetings, to properly discharge their duties. Directors are also expected to attend the Annual Meeting of Shareholders. It is understood that special circumstances may occasionally prevent a director from attending a meeting.

C. Agendas

The Chairman of the Board will establish the agenda for Board meetings. While the agenda is planned carefully, it is flexible enough so that unexpected developments can be discussed at Board meetings. Any director may request that an item be included on the agenda. Throughout each year, the Board of Directors reviews the Corporation's short-term and long-term strategic and operating plans and related business plans of each principal business group. The Board of Directors also reviews the annual capital budget for the Corporation.

D. Advance Materials

Information and data that are important to the Board's understanding of the business to be conducted at a Board or committee meeting are, to the extent practical, distributed to the directors sufficiently in advance of the meeting and directors should review these materials prior to the meeting. The Board acknowledges that certain materials are of an extremely sensitive nature and that distribution of materials on these matters prior to Board meetings may not be appropriate.

E. Executive Sessions

The non-employee directors will meet without employee directors at regularly scheduled executive sessions not less than three (3) times per year and at such other times as the directors deem appropriate. Executive sessions are attended only by non-employee directors, provided, however, that the non-employee directors may, from time to time, request that members of management or others join for portions of the executive session. Executive sessions will be presided over by the Lead Independent Director, and in the absence of the Lead Independent Director, or if none has been elected, the executive sessions will be led by a Director who serves as the Chair of a Board Committee that is composed entirely of independent directors, pursuant to a rotating schedule amongst the Board Committee Chairs.

F. Stock Ownership By Directors

Members of the Board of Directors are required to own stock, stock units or other equity-linked instruments of the Corporation and a significant part of their compensation for services as a director is payable in these instruments.

G. Confidentiality

Except as required by law, no director shall disclose any material, non-public information concerning the Corporation. In the event that a director inadvertently discloses information that may be material and non-public, he or she should immediately so advise the General Counsel.

H. Board Interaction with Institutional Investors, Press, Customers, etc.

The Board believes that, under ordinary circumstances, management speaks for the Corporation and the Chairman speaks for the Board. The Lead Independent Director and other individual Board members may, from time to time, meet with or communicate with various constituencies that are involved with the Corporation. It is expected that Board members would engage in such activities with the knowledge of management and, in most instances, at the request of management.

3. Board Committees

A. Committees

The Board currently has five standing Committees of the Board of Directors: (i) Audit Committee, (ii) Management Development and Compensation Committee, (iii) Nominating and Corporate Governance Committee, (iv) Finance Committee and (v) Public Policy and Responsibility Committee. The Board may also establish other committees or disband existing ones, as it deems appropriate consistent with applicable laws, regulations and the Corporation's By-Laws. Each of the independent Committees of the Board shall have the authority and responsibilities delineated in the Corporation's By-Laws, the resolutions creating them and any applicable charter.

B. Appointment

The Board, upon recommendation of the Nominating and Corporate Governance Committee, appoints committee members. All of the members of the Audit, Management Development and Compensation and Nominating and Corporate Governance Committees will be independent directors consistent with the criteria set forth in their charters and as required by the NYSE and applicable laws and regulations. While not required by law or regulation, the Finance Committee and Public Policy and Responsibility Committee shall also consist of independent directors. The Nominating and Corporate Governance Committee may change committee assignments periodically, and considers committee rotation with a view toward balancing the benefits of continuity against the benefits of diverse experiences and viewpoints of different directors.

C. Meeting Schedules

The Committee Chair, in consultation with management, will schedule regular Committee meetings. Special committee meetings may be called as needed. The length of Committee meetings will depend upon matters under consideration. Any committee meeting may be held telephonically.

D. Committee Agendas

The Committee Chair, in consultation with appropriate officers of the Corporation, will develop the agenda for Committee meetings. Any Committee member may request that an item be included on the agenda.

E. Charters

The Board has adopted charters setting forth the purposes, authority, and duties of each of the Audit Committee, the Finance Committee, the Nominating and Corporate

Governance Committee, the Management Development and Compensation Committee, the Public Policy and Responsibility Committee and any other committee that the Board deems appropriate. Each Committee will periodically review and assess the adequacy of its respective charter and, if appropriate, shall recommend changes to the Board of Directors for approval.

4. Access to Outside Advisors

The Board and its Committees may retain counsel or consultants with respect to any issue without consulting or obtaining the approval of any officer of the Corporation in advance. Further, as set forth in their respective charters:

- The Nominating and Corporate Governance Committee has sole authority to retain and terminate any search firm to be used to identify director candidates.
- The Management Development and Compensation Committee has sole authority to retain and terminate compensation consultants used to advise it with respect to executive compensation.
- The Audit Committee has sole authority to retain and terminate independent auditors.

5. Access to Management and Employees

A. Access to Management and Employees

Directors have full and unrestricted access to the management and employees of the Corporation. In addition, at the request of the Chairman, members of senior management may be invited to attend meetings of the Board of Directors from time to time, to present information about the business and operations of the business within their areas of responsibility.

B. Internal Reporting

The Board has established procedures for the submission and confidential treatment of complaints and concerns of employees regarding accounting and auditing matters and alleged violations of the Corporation's "*Guidelines for Business Conduct: The Merrill Lynch Code of Ethics for Directors, Officers and Employees*" (the "Guidelines for Business Conduct").

C. Whistleblower Protection

As set forth in the Corporation's Guidelines for Business Conduct, any employee who, in good faith, reports a violation or possible violation of the Guidelines for Business Conduct or the underlying corporate policy is protected against retaliatory behavior. Merrill Lynch is not permitted to fire, demote, suspend, harass or discriminate against any employee who lawfully provides information to, or otherwise assists or participates in, any investigation or proceeding by a U.S. regulatory or law enforcement agency, any member of the U.S. Congress or a Congressional committee or the employee's manager, relating to what the employee reasonably believes is a violation of the securities laws or an act of fraud. No Merrill Lynch person is permitted to take any such retaliatory action.

6. Director Compensation

The compensation of directors is reviewed periodically by the Nominating and Corporate Governance Committee. In this regard, the Committee may request that management report to the Committee periodically on the status of the Board's compensation in relation to the Corporation's competitors and other similarly situated companies.

Any change to director compensation must be recommended by the Nominating and Corporate Governance Committee for approval by the full Board of Directors.

7. Director Orientation and Education

All new directors must be provided with these Corporate Governance Guidelines and must participate in the Corporation's orientation initiatives as soon as practicable after the meeting at which they are elected.

The Corporation conducts a comprehensive orientation process for new directors to become familiar with the Corporation's vision, business, strategic direction, financial matters, core values, including ethics, corporate governance practices and other key policies and practices through a review of background materials and meetings with senior management.  At the time a director joins a Committee of the Board, he or she also participates in an orientation session designed to familiarize them with the authorities and responsibilities, as well as the practices of such Committee.

The Board of Directors will periodically receive presentations at Board meetings and periodic strategy sessions relating to the Corporation's business and operations, its strategic plans, its significant financial, accounting, litigation and risk management issues, and its compliance programs. Periodic presentations are also made to the Board of Directors on corporate governance, the fiduciary duties and responsibilities of directors, legal and regulatory developments, as well as any other matters of

significance to the Board of Directors. Additionally, directors are offered the opportunity (but are not required) to participate in director education programs and director institutes offered by third parties.

8. Performance Evaluation and Succession Planning

A. Performance Evaluation

The Management Development and Compensation Committee and the Board of Directors, with input from the CEO, set annual performance goals for the CEO. Each year the Management Development and Compensation Committee and the independent members of the Board assess the performance of the CEO against these performance goals and set the Chief Executive Officer's compensation based on this evaluation.

B. Succession Planning

The Board of Directors is responsible for the succession planning for the position of CEO, with the assistance of the Management Development and Compensation Committee. The Management Development and Compensation Committee reviews plans for succession with input from the CEO. The Management Development and Compensation Committee is provided with an annual report on succession planning and any development recommendations for key individuals.

C. Chairman and CEO Positions

The offices of Chairman of the Board and Chief Executive Officer have been at times combined and at times separated. The Board of Directors has exercised discretion in combining or separating the positions, as it has deemed appropriate in light of prevailing circumstances. The Board of Directors believes that the combination or separation of these offices should continue to be considered as part of the succession planning process. The Board further believes that it is in the best interests of the Corporation for the Board of Directors to make a determination as to the combination or separation of the offices of Chairman of the Board and Chief Executive Officer when it elects a new Chief Executive Officer.

9. Annual Evaluations

A. Board Self-Evaluation

The Nominating and Corporate Governance Committee of the Board will lead the Board in an annual self-evaluation process to determine whether the Board and its committees are functioning effectively. The Nominating and Corporate Governance Committee is responsible for receiving comments from the Board, reviewing them

and reporting annually to the Board an assessment of the Board's performance. The Board will discuss the evaluation report annually. The assessment will focus on the Board's contribution to the Corporation and emphasize those areas in which the Board believes a better contribution could be made. The Nominating and Corporate Governance Committee will establish the criteria to be used in such evaluations.

B. Review of Board's Core Competencies and Composition

The Nominating and Corporate Governance Committee is also responsible for reviewing with the Board, on an annual basis, the skills and characteristics of the Board of Directors and the composition of the Board as a whole. This assessment should include an analysis of the Board's core competencies, including understanding of the financial industry, financial expertise, integrity, wisdom, judgment, commitment to excellence, business experience and acumen, skills, diverse perspectives and availability. As a result of this assessment, the Nominating and Corporate Governance Committee will determine whether the Board is lacking any of the core competencies deemed essential to its effectiveness and whether consideration should be given to any change in the Board's membership.

C. Committee Self-Evaluation

Each of the Audit Committee, the Management Development and Compensation Committee and the Nominating and Corporate Governance Committee will perform an annual review of such Committee's performance, including a review of the Committee's compliance with its respective Charter. Each such Committee shall conduct such evaluation and review in such manner as it deems appropriate and report the results of the evaluation to the entire Board of Directors.

10. Guidelines for Business Conduct

The Board of Directors has updated the Guidelines for Business Conduct and has adopted them as its Code of Ethics for Directors, Officers and Employees, as required by the listing requirements of the NYSE and applicable laws. The Nominating and Corporate Governance Committee will periodically review the Guidelines for Business Conduct and propose modifications to the Board of Directors for consideration as appropriate.

11. Revisions to these Corporate Governance Guidelines

The Nominating and Corporate Governance Committee will review these Corporate Governance Guidelines periodically and will recommend to the Board such revisions, as it deems necessary or appropriate for the Board to discharge its responsibilities more effectively.

199.    In addition, the charters of the various Committees of the Company's Board also imposed enhanced duties on the Director Defendants sitting on those Committees.

200.    Pursuant to its Charter, the Audit Committee had the following express duties and responsibilities, among others:

- "review and oversee management's policies and processes for managing the major categories of risk affecting the Corporation, including operational, legal and reputational risks, and the steps management has taken to assess and control such risks";

- "monitor the Corporation's compliance function, including compliance with the Corporation's policies [and] review with the Corporation's General Counsel and Director of Corporate Audit the adequacy and effectiveness of the Corporation's procedures to ensure compliance with legal and regulatory requirements";

- "discuss, as appropriate, the adequacy of the Corporation's internal controls with the Corporate Audit Department, the independent auditor and management, including, without limitation, reports regarding (a) significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting and (b) any fraud, whether or not material, that involves management or other employees who have a significant role in the Corporation's internal control over financial reporting";

- "discuss with management, the Corporation's General Counsel and the independent auditor any correspondence with regulators or governmental agencies and any published reports that raise material issues regarding the Corporation's financial statements or accounting policies";

- "meet to review and discuss with management and the independent auditor the Corporation's annual audited and quarterly consolidated financial statements, including the disclosures contained in the Corporation's Annual Report on Form 10-K . . . and its Quarterly Reports on Form 10-Q";

- "discuss with management the Corporation's earnings press releases, including the use of 'pro forma' or 'adjusted' non-GAAP information, and financial information and earnings guidance, if any, provided to analysts and rating agencies"; and

- "participate in the appointment and performance evaluation of the Corporation's Head of the Corporate Audit Department [and] review the adequacy of resources to support the internal audit function, and, if appropriate, recommend changes"

201. The Audit Committee's Charter was explicit about the crucial role played by the Committee at Merrill: "The Committee's role is one of *oversight*." (Emphasis added.)

202. As detailed herein, defendants Reese (Chair), Jonas, Prueher, and Rossotti failed completely to carry out their duties and responsibilities as members of the Audit Committee set forth above, including the duty of oversight.

203. Pursuant to its Charter, the Finance Committee had the following express duties and responsibilities, among others:

- "review the Corporation's policies and procedures for managing exposure to market and credit risk, including the framework for counterparty credit risk management, trading limits and VAR or other relevant models";

- "review significant risk exposures and trends in each of these categories of risk";

- "review and approve the Corporation's policies governing the use of funds to acquire, create or dispose of an asset of long term value";

- "review and approve the Corporation's policies governing ownership stakes in entities, funds or assets other than through a liquid or publicly traded security, where the investment is intended to be monetized or is not intended to be operated as a core business ('principal investments')";

- "review and approve specific financial commitments and principal investments to the extent required by such policies";

- "periodically review financial commitments and principal investments effected pursuant to such policies";

- "review the annual financial and operating plan";

- "review the Corporation's financing plan, including funding and liquidity policies and programs";

- "review management's framework for balance sheet management, including categories of assets and liabilities and levels of commitment[, and] periodically review capital allocation methodologies"; and

- "review regulatory capital, leverage ratios and similar measures of capital adequacy".

204.     As detailed herein, defendants Rossotti (Chair), Cribiore, Finnegan, and Reese failed completely to carry out their duties and responsibilities as members of the Finance Committee set forth above, including the duty of oversight.

205.     Pursuant to its Charter, the Management Development and Compensation Committee had the following express duties and responsibilities, among others:

- "review and approve corporate goals and objectives relevant to the compensation of the individuals holding one or more of the positions of Chairman of the Board, CEO, and President of the Company";

- "review periodically the Company's compensation programs and policies to align them with the Company's annual and long-term goals and the interests of shareholders";

- "present to the Board an annual evaluation of the performance of the Chairman of the Board, CEO and President in light of specified goals and objectives[, and] determine the compensation of the Chairman, CEO and President based on this evaluation [and] discuss their determinations with the Board and submit them to the Board for ratification";

- "review and approve annual cash and stock-based incentive compensation for all other Senior Management employees and for such other employees identified by the Committee or management"; and

- "review overall policy regarding compensation and benefit programs that are generally available to employees and make such recommendations as it deems appropriate with respect to such programs".

206.    As detailed herein, defendants Finnegan (Chair), Codina, Colbert, Cribiore, and Peters failed completely to carry out their duties and responsibilities as members of the Management Development and Compensation Committee set forth above, including the duty of oversight.

207.    Pursuant to its Charter, the Nominating and Corporate Governance Committee had the following express duties and responsibilities, among others:

- "[e]stablish criteria for the selection of directors to serve on the Board of Directors";

- "[i]dentify individuals believed to be qualified as candidates to serve on the Board of Directors; conduct all necessary and appropriate inquiries into the backgrounds and qualifications of such candidates and recommend that the Board select the candidates for directorships to be filled by the Board of Directors or by the shareholders from such identified individuals";

- "review the compensation and benefits of non-employee members of the Board of Directors [and] [r]ecommend changes to the Corporation's director compensation policy to the Board of Directors for consideration as appropriate";

- "[e]stablish, monitor and recommend to the Board the purpose, structure and operations of the various committees of the Board, the qualifications and criteria for membership on each committee of the Board and, as circumstances dictate or the Committee otherwise deems appropriate, make any recommendations regarding periodic rotation of Directors among the committees";

- "[i]n consultation with the Chairman of the Board and the committee Chairs, recommend members of the Board of Directors to serve on the committees of the Board, giving consideration to the criteria for service on each committee as set forth in the charter for each such committee, and, where appropriate, make recommendations regarding the removal of any member of any committee";

- "[r]ecommend members of the Board of Directors to serve as the Chair of the committees of the Board";

- "[e]valuate whether the necessary and appropriate committees exist to support the work of the Board and make recommendations to the Board of Directors for the creation of additional committees or the elimination of Board committees as appropriate";

- "periodically review the [Corporation's Guidelines for Business Conduct: The Code of Ethics for Directors, Officers and Employees] and propose modifications to the Guidelines to the Board of Directors for consideration as appropriate";

- "oversee the Corporation's policies governing the review and approval or ratification of 'Related Party Transactions' and . . . review and approve amendments to such policies";

- "[l]ead and oversee the Board of Directors in an annual self-evaluation process to determine whether the Board and its committees are functioning effectively"; and

- "[a]ssess, on an annual basis, the skills and characteristics of the Board of Directors as a whole [including] an analysis of the Board's core competencies, including understanding of the financial industry, financial expertise, integrity, wisdom, judgment, commitment to excellence, business experience and acumen, skills, diverse perspectives and availability".

208.    As detailed herein, defendants Codina (Chair), Colbert, Cribiore, and Finnegan failed completely to carry out their duties and responsibilities as members of the Nominating and Corporate Governance Committee set forth above, including the duty of oversight.

209.    Pursuant to its Charter, the Public Policy and Responsibility Committee had the following express duties and responsibilities, among others:

- "review and have oversight of management's framework for identifying significant public policy issues that may arise in the Corporation's current or proposed business operations, for

applying ethical standards, and for providing direction to appropriately address them,"
including

- the [r]eputational impact of the Corporation's relationships with certain governments,
  entities or individuals".

210.    As detailed herein, defendants Prueher (Chair), Christ, Colbert, Jonas, and Peters
failed completely to carry out their duties and responsibilities as members of the Public Policy and
Responsibility Committee set forth above, including the duty of oversight.

211.    Merrill Lynch has a Policy & Procedures Manual (the "Policies Manual").  The
Policies Manual employs a so-called "Chinese Wall," which is designed to prevent "the misuse of
material non-public information" and to prevent "even the appearance of impropriety."

212.    The "Chinese Wall" is designed to "restrict and monitor the flow of information
between the various areas [of Merrill] such as Global Research, Sales [and] Trading" and "to avoid
the misuse of such information and the appearance of impropriety as well as to manage potential
conflicts of interest . . . ."

213.    Among those departments that constitute the "Private Side of the Wall" include:
"Investment Banking, including Global Capital Markets and Financing (Equity Capital Markets and
Debt Capital Markets)" and "other departments or individuals that regularly receive inside
information."  By contrast, the Research Department is on the "Public Side of the Wall."

214.    "Confidential Information" is defined in the Policies Manual as "[n]on-public
information that is received or created by Merrill Lynch in the course of its business activities."

215.    "Material Information" is defined as that information in which "there is a substantial
likelihood that a reasonable investor would consider the information important in deciding whether

or not to purchase, hold, or sell a security or other financial instrument" and includes "liquidity problems, defaults or other credit-related problems or events" and "increases or declines in orders for the company's securities."

216.    "Proprietary Information" is defined as "[n]on-public information of whatever type that is created or obtained by Merrill Lynch for the firm's business purposes."  Examples include "unpublished research information, opinions, and recommendations," "non-public information about Merrill Lynch's securities trading positions and securities products," and "Merrill Lynch's intentions regarding its proprietary accounts, investment, trading, lending activities or financial strategies or decisions."

217.    Among the categories of information that cannot be discussed between Sales & Trading, and Research, are the levels or amounts of inventory that Merrill maintained for its own account.

218.    Finally, Defendants were responsible for maintaining and establishing adequate internal accounting controls for the Company and to ensure that the Company's financial statements were based on accurate financial information.  According to Generally Accepted Accounting Principles ("GAAP"), to accomplish the objectives of accurately recording, processing, summarizing, and reporting financial data, a corporation must establish an internal accounting control structure.  Among other things, this required Defendants to:  (a) make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer; and (b) devise and maintain a system of internal accounting controls sufficient to provide reasonable assurance that: (i) transactions are executed in accordance

with management's general or specific authorization; and (ii) transactions are recorded as necessary to permit preparation of financial statements in conformity with GAAP.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

219.    At all relevant times, as a result of their membership in the Board, various Committees of the Board, and/or senior management of the Company, as well as the powers available to each of them as a result of these memberships, the Defendants each had access to internal corporate documents, conversations, and connections with other corporate officers and employees, attended management and Board meetings, and committees thereof, and was provided with reports and other information about the Company prior to their public dissemination.

220.    Accordingly, and because of their positions of trust, loyalty, and fidelity to Merrill, Defendants knew or should have known:  (a) the adverse, material information about the business of Merrill that they failed to disclose to the investing public, which subjected the Company to lawsuits by and ultimately huge damages paid to shareholders; (b) the true state of affairs at Merrill as to which they caused the Company to affirmatively offer false and misleading guidance to investors (including the dissemination of false press releases and false filings with the SEC throughout the Relevant Period; (c) the nature of their fiduciary duties to Merrill, including the elaborate, duties that the Company required of them, and their active breach of those very same duties; (d) the absence of any meaningful internal controls and procedures that would have prevented the Defendants' manipulation of the market for ARS, their deception of its own customers, and the Company's resulting exposure to government investigations, lawsuits, and the need to repurchase or otherwise carry tens of billions of dollars of essentially worthless ARS on its books; (e) the waste of Company assets represented by Merrill's decision to pay Defendants lavish salaries, bonuses, and other

compensation even though they had exposed the Company to tens of billions of dollars in settlements, ARS repurchases, and other liabilities; and (f) the conflicts of interests among themselves which caused Defendants to act in their own self-interest and contrary to the interests of Merrill.

221.    At all relevant times, the Defendants individually and collectively engaged in a course of conduct that was consciously designed to and did: (a) enhance the Defendants' directorial and managerial positions at Merrill, as well as the power and prestige accruing to Defendants as a result of holding those positions, and transfer exorbitant unearned and wasteful sums of money to themselves; (b) expose Merrill to a liability for Defendants' conscious manipulation of the ARS market, their deception of Company customers, and their exposure of the Company to government investigations, lawsuits, and the need to repurchase or otherwise carry tens of billions of dollars of essentially worthless ARS on its books; (c) conceal the fact that the Company was grossly misrepresenting its financial results in order to allow Defendants to hide the Company's liability arising from the manipulation of the ARS market at least long enough to allow certain Defendants to pay themselves enormous bonuses for 2007, and all Defendants' substantial bonuses and other compensation; and (d) otherwise deceive the investing public, including Merrill's own shareholders, as to the Defendants' management of Merrill's operations, the Company's financial health, stability, the accuracy and integrity of its accounting policies and other internal controls, and its and business prospects, exposing the Company to massive damages and incalculable reputational loss among its actual and potential customers and investors.

222.    In committing the wrongful acts alleged herein, Defendants pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one

another in furtherance of their common plan or design.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, Defendants further aided, abetted, and/or assisted one another in breaching their respective duties.

223.     At all relevant times, each of the Defendants was the agent of each of the other Defendants, and was at all times acting within the course and scope of such agency.

224.     Each of the Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of the wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

225.     Defendants engaged in a conspiracy, common enterprise and/or common course of conduct commencing on July 1, 2007 and continuing thereafter regarding the ARS market, as well as the Company's financial statements and other statements regarding Merrill's performance and financial condition.  During this time, Defendants caused Merrill to conceal the true fact that defendants had caused the Company to misrepresent its financial results, deceive customers and shareholders, manipulate the ARS market, and expose the Company to government investigations, lawsuits, and the need to repurchase or otherwise carry tens of billions of dollars of essentially worthless ARS on its books.  In addition, Defendants also made specific, improper statements about Merrill's financial performance, and its future business prospects throughout the Relevant Period.

226.     The purpose and effect of Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise Defendants' violations of federal and state law, breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate

assets and unjust enrichment; to conceal adverse information concerning the Company's operations, financial condition and future business prospects; and to artificially inflate the price of Merrill common stock so they could, among other things: (i) usurp tens of millions of dollars in unearned bonus, salaries, stock awards, and other emoluments, and (ii) protect and enhance defendants' executive and directorial positions and the substantial compensation and prestige they obtained as a result thereof.

## CLAIMS FOR RELIEF

## COUNT I

## Against All Defendants for Breach of Fiduciary Duties

227.   The Retirement System incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

228.   Defendants owed and owe Merrill fiduciary obligations.  By reason of their fiduciary relationships, the Officer Defendants and the Director Defendants owed and owe Merrill the highest obligation of good faith, fair dealing, loyalty, oversight, and due care.

229.   Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.  Each of the Defendants had actual or constructive knowledge that Defendants had caused the Company to manipulate the market for ARS, deceive its own customers, become exposed to government investigations, lawsuits, and the need to repurchase or otherwise carry tens of billions of dollars of essentially worthless ARS on its books, and mislead shareholders.

230.    Defendants consciously failed to implement an effective system of internal controls over its ARS marketing and trading operations and/or consciously failed to oversee the operations of such control systems.

231.    Defendants knowingly caused or allowed the Company's financial statements to be materially misstated due to Defendants' knowing pretense that the market for ARS was liquid.

232.    Defendants failed in good faith to supervise, and to exert internal controls over, and consciously disregarded responsibilities involving the Company's trading and marketing operations of ARS securities.

233.    Defendants also knowingly caused Merrill's financial statements during the Relevant Period to be materially misleading and not prepared in accordance with GAAP principles.

234.    As a direct and proximate result of Defendants' failure to perform their fiduciary obligations, Merrill has sustained significant damages.  As a result of the misconduct alleged herein, each of the Defendants is liable to the Company.

235.    The Retirement System on behalf of Merrill has no adequate remedy at law.

## COUNT II

### Against the Insider Selling Defendants for Breach of Fiduciary Duties

236.    The Retirement System incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

237.    At the time of each of the stock sales set forth herein, each of the Insider Selling Defendants knew, but did not disclose publicly, the material information described herein.  Each of the Insider Selling Defendants made each of his or her sales of stock between January 1, 2007 and

the present on the basis of and because of his or her knowledge of this material, non-public information.

238.    At the time of their stock sales, each of the Insider Selling Defendants knew that when the material information described herein was publicly disclosed, the price of the Company's stock would dramatically decrease.  These defendants' sales of Merrill common stock based on their knowledge of the material, non-public information was a breach of their fiduciary duties of loyalty and good faith.

239.    As a result of this misconduct, the Insider Selling Defendants are liable to the Company.  The Company is entitled to have a constructive trust imposed on any proceeds obtained by these defendants obtained thereby.

240.    The Retirement System on behalf of Merrill has no adequate remedy at law.

## COUNT III

### Against All Defendants for Abuse of Control

241.    The Retirement System incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

242.    Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Merrill, for which they are legally responsible. Among these abuses of control were:

> (i)    Defendants' failure to in good faith supervise and exert internal controls over, and their conscious disregard of responsibilities involving the Company's operations in the trading and marketing of ARS securities, and their knowing failure to disclose the true accounting, operational and financial condition of the Company;

(ii)      Defendants' knowingly causing or allowing Merrill to prepare and publish financial statements that were materially misstated due to defendants' concealment of the illiquid market for ARS and the Company's exposure to government investigations, lawsuits, and the need to repurchase or otherwise carry tens of billions of dollars of essentially worthless ARS on its books; and

(iii)      Defendants' knowingly causing, allowing and/or arranging the payment of tens of millions of dollars more in improper salaries, bonuses, and other compensation – and to award themselves lucrative new compensation packages – at a time when, as a direct and foreseeable consequence of their wrongdoing, the Company was exposed to tens of billions of dollars in losses;

243.     As a direct and proximate result of Defendants' abuse of control, Merrill has sustained significant damages.

244.     As a result of the misconduct alleged herein, Defendants are liable to the Company.

245.     The Retirement System on behalf of Merrill has no adequate remedy at law.

## COUNT IV

### Against All Defendants for Gross Mismanagement

246.     The Retirement System incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

247.     By their actions alleged herein, Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Merrill in a manner consistent with the operations of a publicly held corporation.

248.    Defendants caused or allowed Merrill to lack requisite internal controls, and as a result, the Company's projections and reported results were based upon defective assumptions and/or manipulated facts.

249.    Defendants caused or allowed the Company's financial statements to be materially misstated due to Defendants' knowing failure to prevent Merrill's manipulation of the market for ARS, its deception of its own customers, and its resulting exposure to government investigations, lawsuits, and the need to repurchase or otherwise carry tens of billions of dollars of essentially worthless ARS on its books.

250.    Based on the foregoing, Defendants caused or allowed Merrill's financial statements to be materially misleading and not prepared in accordance with GAAP principles during the Relevant Period.

251.    As a direct and proximate result of Defendants' gross mismanagement and breaches of fiduciary duty alleged herein, Merrill has sustained significant damages in excess of hundreds of millions of dollars. In fact, Merrill's market capitalization was reduced by tens of billions of dollars during the Relevant Period and especially during the last few months alone.

252.    As a result of the misconduct and breaches of duty alleged herein, Defendants are liable to the Company.

253.    The Retirement System on behalf of Merrill has no adequate remedy at law.

## COUNT V

### Derivatively Against All Defendants for Violation of § 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder

254.    The Retirement System incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

255.    Throughout the Relevant Period, Defendants, by the use of means or instrumentalities of interstate commerce, the United States mails, interstate telephone communications, and a national securities exchange, employed a device, scheme, or artifice to defraud, made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances in which they were made, not misleading, and engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the Company and shareholders in connection with their purchases of Merrill during the Relevant Period, all in violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

256.    Defendants, as the most senior officers and/or members of the Board of Directors of Merrill and various Committees of the Board during the Relevant Period, are liable as direct participants in all of the wrongs complained of herein.  Through their positions of control and authority, Defendants were in a position to and did control all of the false and misleading statements and omissions made on behalf of the Company, including the contents of all its public filings and reports and press releases, as more particularly set forth above.  In addition, certain of these false and misleading statements constitute "group published information," which Defendants were responsible for creating.

257.    Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them and they had express responsibility for knowing such facts.  Such material misrepresentations and omissions were made knowingly or recklessly and for the purpose and effect of concealing the Company's true financial and operating condition from shareholders and supporting an artificially inflated price of the Company's common stock.

258.    Defendants had the motive and opportunity to commit fraud.  By virtue of their positions of control over the entire management of the Company, the Director Defendants had unquestioned opportunity to issue statements that they knew were false and misleading.  Each of the Officer Defendants had direct operative control over the Company's practices in the pricing, offering, valuation, sales, trading, and marketing of ARS, as well as the integrity of the division between its Research Department and its sales and trading departments.  Each of the Defendants had the motive to mislead investors as to the Company's true exposure to these instruments, because, among other things:

(a)    During the Relevant Period, each of the Officer Defendants wanted to paint a picture of Merrill as being as profitable as possible so as to ensure the maximum possible bonus and other performance-based compensation for the fiscal year; accordingly, each of these Defendants was motivated to conceal the Company's true exposure to an inventory of illiquid ARS;

(b)    In particular, each of the Officer Defendants received significant compensation including a program of bonuses when Merrill reached certain financial and

earnings targets.  The target bonuses rewarded executives on a variety of factors, including the profitability of the Company's operations in the trading and marketing of ARS.  The Officer Defendants, therefore, understood that announcing that Merrill stood to lose billions of dollars from revelation that the ARS market was not liquid, and that the Company had manipulated the market to deceive its own customers on that topic, would directly and negatively impact their bonuses;

(c)     Defendants further benefited from high stock prices for Merrill when they sold the stock they received through stock, option, and other awards.  As set forth *supra*, since January 1, 2007, Defendants sold millions of dollars worth of Company stock.  If Defendants had caused the Company to report losses in a timely manner, the stock price would have fallen and the amount of money Defendants received from their stock price correspondingly would have decreased by 50 percent or more;

(d)     In addition, each of the Defendants, by virtue of being a shareholder of Merrill, was motivated to conceal the Company's exposure to losses and other liabilities in the ARS market as a result of the illiquidity of that market and Defendants' manipulation thereof so as to maintain an artificially high price for the Company's stock;

(e)     Defendants were motivated to overstate Merrill's financial results, and keep its stock price high, so as to protect their positions of power, authority, prestige, and personal remuneration at the Company, including out-sized salaries, directors' fees, stock awards, and other emoluments worth multiple millions of dollars to most Defendants and to some, *tens of millions of dollars*.

259.    In purchasing its stock, the Company or its shareholders relied upon the Defendants' statements and/or the integrity of the market in making their purchases.

260.    Accordingly, Defendants violated § 10(b) of the Exchange Act and Rule 10b-5 thereunder in that they:

(a)    employed devices, schemes and artifices to defraud;

(b)    made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

(c)    engaged in acts, practices and a course of business that operated as a fraud or deceit upon Merrill and others in connection with their purchases of Merrill common stock during the Relevant Period.

261.    As a result of Defendants' misconduct, Merrill has suffered and will suffer damages in that it paid artificially inflated prices for Merrill common stock purchased on the open market. Merrill would not have purchased Merrill common stock at the prices it paid had the market been aware that the market price of Merrill's stock was artificially and falsely inflated by Defendants' misleading statements.  As a direct and proximate result of these defendants' wrongful conduct, Merrill suffered damages in connection with its purchases of Merrill common stock during the relevant period.  By reason of such conduct, Defendants are liable to the Company.

262.    The Retirement System on behalf of Merrill has no adequate remedy at law.

## PRAYER FOR RELIEF

**WHEREFORE**, the Retirement System demands judgment as follows:

A.     Against all Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of Defendants' breaches of fiduciary duties, abuse of control, gross mismanagement, and violations of federal law;

B.     Extraordinary equitable and/or injunctive relief as permitted by law, equity and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on or otherwise restricting Defendants' assets until the Company can recoup all of the monies improperly transferred to Defendants, and the proceeds to the Insider Selling Defendants from their sales of Company common stock based on material, non-public information, so as to assure that the Retirement System on behalf of Merrill has an effective remedy;

C.     Declaring that the Defendants are liable under of § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder and awarding Merrill damages;

D.     Declaring that Defendants' improper payments to themselves through the Company's coffers of unearned bonuses, compensation, stock awards, fees, and other illicit transfers – as well any assets or property acquired with such payments – be held in constructive trust for the Company's benefit;

E.     Awarding to Merrill restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits and other monies obtained by Defendants;

F.     Directing Merrill to take all necessary actions to reform and improve their corporate governance and internal procedures regarding the pricing, offering, valuation, sales, trading, and marketing of ARS, as well as the integrity of the division between the Company's

Research Department and its sales and trading departments, so as to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote the following Corporate Governance Policies:

  (i) strengthening the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

  (ii) controlling and limiting improper payments of unearned compensation, corporate benefits, stock awards, and other emoluments;

  (iii) permitting shareholders of Merrill to nominate at least three candidates for election to the Board;

  (iv) appropriately testing and then strengthening the internal audit and control functions demanded herein;

  (v) replacing completely the current memberships of the Audit Committee, the Finance Committee, and Management Development and Compensation Committee;

  (vi) establishing enhanced minimum qualifications for members of the Audit Committee, Finance Committee, and the Management Development and Compensation Committee;

  (vii) establishing a Committee of the Board charged with monitoring and minimizing the risk to the Company from its activities in various types of derivative

securities, such as ARS, whose volatility or liquidity might create financial issues for the Company, its trading partners, or its customers, or damage its reputation;

(viii)    erecting an unbridgeable ethical wall between the Research Department and the Sales & Trading and other departments at Merrill which generate revenue from the sale of securities analyzed by the Research Department, precluding employees of the Sales & Trading and other departments from influencing the content of the Research Department's reports;

(ix)    reforming Company compensation policies so as to preclude the payment of any compensation to Research Analysts which would encourage the analysts to provide other than objective reports which reflect the honest assessments of the analysts to the best of their knowledge, information, and belief;  and

(x)    preventing the Company from underwriting or selling any new derivative securities without adequate safeguards that such securities will trade in a liquid markets without the need for supportive or manipulative activities by the Company that violate Company policies, ethical norms, industry standards, or federal or state securities laws;

G.    Awarding the Retirement System the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses;

H.    Granting such other and further relief as the Court deems just and proper

## JURY DEMAND

The Retirement System demands a trial by jury.

Dated:  August 19, 2008

KAHN GAUTHIER SWICK, LLC

_____

Lewis S. Kahn
Albert M. Myers (AM-2750)
Kevin Oufnac
650 Poydras Street, Suite 2150
New Orleans, LA 70130
Telephone: (504) 455-1400
Facsimile:  (504) 455-1498

Michael Swick (MS-9970)
12 East 41st Street—12th Floor
New York, NY 10017
Telephone: (212) 696-3730
Facsimile:  (504) 455-1498

*Attorneys for Plaintiff the Louisiana Municipal Employees Retirement System*

## VERIFICATION

I, Kathy Bourque, am the Director of the Louisiana Municipal Police Employees' Retirement System (MPERS). I declare that I have reviewed the Shareholder's Derivative Complaint in the case captioned *Louisiana Municipal Police Employees' Retirement System v. John A. Thain, et. al.*, S.D.N.Y.; and, I have the authority to authorize its filing on behalf of MPERS; and, I do authorize the filing of this complaint on behalf of MPERS . I have reviewed the allegations made in the Complaint, and to those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation and for that reason I believe them to be true. I further declare that MPERS is a current owner of Merrill Lynch & Co., Inc. common stock and has been an owner of such stock from at least July 2006 to the present.

August _19_, 2008.

Kathy Bourque
Director, Louisiana Municipal Police Employee's
Retirement System
7722 Office Park Blvd., Suite 200
Baton Rouge, LA 70809